SULLIVAN, Respondent, *v.* MARSH, et al., Appellants.
No. 8978.
Submitted October 9, 1950. Decided December 18, 1950.
225 Pac. (2d) 868.

Mr. Sam C. Ford, Helena, Messrs. Burns and Thomas, Chinook, Mr. J. F. Emigh, Butte, for defendant Marsh.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Wesley W. Wertz, Spec.

Asst. Atty. Gen., Mr. Thomas F. Joyce, Asst. Atty. Gen., for Montana Liquor Control Board.

Mr. Sam C. Ford, Mr. Thomas F. Joyce, Asst. Atty. Gen., and Mr. J. F. Emigh argued the case orally for appellants.

Messrs. Sias and O'Donnell, Chinook, Messrs. Multz and Hanley, Helena, for respondent. Mr. Multz and Mr. Hanley argued the cause orally.

THE HON. W. W. LESSLEY, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, disqualified:

This is a suit in equity seeking to have the court decree the reformation of two written contracts.

The first contract was executed May 27, 1944, by William J. Sullivan, first party, and Harvey A. Marsh and Charles Tappa, second parties.

The second contract was executed July 12, 1944, by William J. Sullivan, first party, and Harvey A. Marsh only, second party.

Each contract involves the same property. Each contract was duly acknowledged on the date of its execution before the same notary public. Each contract is for the sale of a stock of liquor and for the leasing for the same term of certain premises and property in Chinook, Montana, known as the Montana Hotel, owned by the plaintiff William J. Sullivan. The hotel contains 31 rooms in addition to a lobby and a large room originally used as a restaurant.

From the years 1933 to 1935, the plaintiff Sullivan operated the property as a hotel and restaurant, but upon the repeal of prohibition he converted the restaurant into a bar and from 1937 to July 1944, he personally operated both the hotel and the bar.

In the late spring of 1944, plaintiff decided that because of continued ill health he was no longer able to operate the business and that upon the expiration of his state retail beer and liquor licenses (June 30, 1944) he would sell his stock of liquor and give a term lease on his hotel property including the bar.

With such end in view, plaintiff entered into negotiations with Charles Tappa and Harvey A. Marsh, resulting in an agreement whereby plaintiff agreed to sell to Tappa and Marsh, plaintiff's stock of liquor on hand and to give them a five-year lease on the hotel and bar including the furniture, furnishings and equipment therein.

Plaintiff caused D. J. Sias, attorney at law of Chinook, to draft a written contract evidencing the agreement, which contract the parties duly executed and acknowledged on May 27, 1944. Neither Tappa nor Marsh suggested or caused any change whatsoever to be made in the instrument as prepared by plaintiff's attorney.

July 1, 1944, Tappa and Marsh entered into possession of the property, pursuant to the aforesaid written contract.

State retail beer and liquor licenses for the year commencing July 1, 1944, were issued to, and in the names of the co-partners, Tappa and Marsh, and they operated the bar thereunder for 12 days, at the end whereof the partnership was dissolved and Marsh, purchasing the interest of Tappa, took over the business.

July 12, 1944, Marsh entered into a second written contract with Sullivan, identical with the contract of May 27th, except that Tappa was not a party to the second contract and except for a paragraph designated 8, which was added to the second contract.

By the terms of the contract of July 12, 1944, the hotel property including the bar was leased to Marsh "his heirs, administrators and assigns for the full term of five (5) years from and after July 1, 1944, at a yearly rental of Three Thousand and No/100 Dollars ($3,000.00) to be paid in equal monthly payments on the first day of each month."

Paragraph 8 of the contract reads: "This lease supersedes and replaces that certain lease made and entered into under date of May 27th, 1944 between Wm. J. Sullivan as Lessor and Harvey A. Marsh and Charles Tappa, as Lessees, the partnership then existing between the said lessees named in said lease having been

dissolved by agreement between the said partners and Harvey A. March having purchased the interest of the said Charles Tappa in said partnership.''

The contract contains no option or provision for any renewal thereof at the expiration of its term, and the only mention that it makes of licenses is a provision that ''the Lessor agrees to aid and assist the Lessee in obtaining state and city licenses for the operation of said bar.''

The state retail beer and liquor licenses required for the fiscal years 1945-1946, 1946-1947, 1947-1948, and 1948-1949, were issued to and in the name of the defendant Marsh only, as owner and operator of the bar.

During the remainder of the contract term Marsh operated the property and expended considerable time and money in protecting and improving the same and fully performed all of the obligations imposed upon him by virtue of the contract.

A few weeks before June 30, 1949, when the contract term was to expire, the defendant Marsh attempted to obtain from the plaintiff Sullivan, a renewal of his contract for an additional term, but Sullivan declined to consent thereto and gave notice to Marsh to deliver possession of the demised property upon the expiration of the term.

Sullivan's testimony is that when Marsh applied to him for an extension of the term: ''I said, 'No,' I wasn't going to and he would have to take some place up town if he was going to.''

Again on his direct examination plaintiff testified: ''Q. What did you do, if anything, with reference to this license, as to Mr. Marsh? A. Well, I asked Mr. Marsh if he was going to give me the license and he says: 'If I get money enough for it'.''

Plaintiff rejected Marsh's offer to sell and transfer Marsh's interest in the licenses and instead, plaintiff made application to the Montana liquor control board for issuance to him of state retail beer and liquor licenses for the premises for the fiscal year beginning July 1, 1949, and ending June 30, 1950.

By the enactment of the ''Quota Law,'' being Chapter 226 of

the Session Laws of 1947, pp. 326-328, the state legislature established and fixed limitations on the number of licenses which the Montana liquor control board may issue in the various cities and towns of the state, but providing that licenses already issued which are in excess of said limitations and which are in effect at the time of the approval of the Act "shall be renewable but no new licenses shall be issued until the number of licenses shall be reduced to within * * * the * * * limitations" specified.

At the time plaintiff made application for licenses for the fiscal year 1949-1950, the number of outstanding licenses issued to licensees in Chinook exceeded the quota fixed by statute and the board denied plaintiff's application and declined to issue him the licenses sought.

Paragraph designated 6 of the contract of July 12, 1944, provides: "At the expiration of the said term, the Lessee will peaceably yield up to the Lessor the premises and all erections and additions made upon the same, in good repair and all reasonable wear and tear and damage by fire and unavoidable cas ualties accepted, as the same are or may be put in by the Lessor. The Lessee agrees that upon the termination of this lease, he will surrender and yield up to the Lessor, the fixtures and equipment hereby let to them in connection with the lease of said premises and that in the event any of said equipment or fixtures shall at the said time be damaged or missing, he will pay to the Lessor a reasonable value thereof."

On June 29, 1949, being the day before Marsh's contract with him was to expire, plaintiff filed his amended complaint in this action against Marsh and the Montana liquor control board seeking to have the court reform the contract of May 27, 1944, given to Marsh and Tappa, as well as the subsequent contract of July 12, 1944, given to Marsh alone, and to enjoin the Montana liquor control board from cancelling or approving any transfer of the licenses held by Marsh or from issuing to Marsh any new licenses and to have the court make a decree directing and compelling

Marsh to assign and transfer his liquor license to the plaintiff Sullivan.

More specifically, in this action plaintiff seeks to have the trial court adjudge that paragraph 6 contained in each contract be changed by inserting in the second sentence thereof the word "licenses" after the words "the fixtures" and before the words "and equipment" so as to make the contracts provide that the lessee, Harvey A. Marsh "agrees that upon the termination of this lease, he will surrender and yield up to the Lessor, the fixtures, *licenses*, and equipment" so let.

On July 1, 1949, the defendant Marsh surrendered and delivered to the plaintiff Sullivan the full and complete possession of all the demised property including all the fixtures and equipment let to him in connection with the lease of the premises as is provided and written in the contracts, but he declined to transfer or assign to plaintiff his right and interest in his state beer and liquor licenses without being compensated therefor.

A trial, had before the court sitting without a jury, resulted in a decree for plaintiff adjudging that the contracts be reformed by inserting in paragraph 6 of each contract at the place indicated, the word "licenses." The decree also orders the defendant Marsh to make and execute to plaintiff an assignment of his state retail beer and liquor licenses and awards judgment for costs against Marsh. This is an appeal from such judgment.

The determinative question presented is plaintiff's right to the reformation ordered and adjudged.

This is a suit in equity. The statute requires that in such suits "the supreme court shall review all questions of fact arising upon the evidence presented in the record * * * and determine the same, as well as questions of law, unless, for good cause, a new trial or the taking of further evidence in the court below be ordered." R. C. M. 1947, sec. 93-216; Higby v. Hooper, 124 Mont. 331, 221 Pac. (2d) 1043; Hart v. Barron, 122 Mont. 350, 204 Pac. (2d) 797; Miller v. Miller, 121 Mont. 55, 190 Pac.

(2d) 72; State ex rel. Nagle v. Naughton, 103 Mont. 306, 310, 311, 63 Pac. (2d) 123, and cases therein cited.

State retail liquor licenses for the fiscal years 1944-1945, 1945-1946 and 1946-1947 were issued long prior to the enactment of the "Quota Law," Ch. 226, Laws of 1947, by the 1947 legislature. It was the enactment of this law long after the contracts were entered into and at a time when more than one-half of the contract term had expired, that made liquor licenses more difficult to obtain. It is the renewal privilege accorded to licensees by the 1947 Act that makes of an outstanding state retail liquor license a treasure to be eagerly sought in all communities where the quota has been exceeded.

Were it not for the "Quota Law" enacted almost three years after the contracts were entered into with the plaintiff Sullivan, neither he nor Marsh would have encountered any difficulty in obtaining from the board, state retail liquor licenses for the fiscal year of 1949-1950, nor, had the quota for Chinook not been exceeded at the time Sullivan made application to the board in June 1949, would plaintiff then have experienced any difficulty in obtaining a license. Thus have the changes in the statutes effected by the enactment of the "Quota Law" long after the contracts were made, precipitated this controversy.

The right to have a court of equity decree the reformation of ▆ a written instrument is not absolute. While the remedy is well recognized, it is not to be administered arbitrarily. Such relief when granted must flow from and be in accord with the agreements and obligations of the parties.

While the chancellor must always proceed with the utmost caution in suits of this character, he must proceed even more cautiously in cases such as this, where, since the contracts were executed, new legislation, enacted long after the contracts were entered into affecting the procuring of liquor licenses, has given exceptional importance to the alleged "mistake" of which the plaintiff complains.

One may not employ a suit for reformation of a contract for

 the purpose of making an entirely new agreement. Such suits are only to establish and perpetuate an already existing contract, and to make it express the real intent of the parties as such intent existed at the time of the making of the agreement. A court of equity is not empowered to supply by decree an agreement which was never made. It is not empowered to amend and alter a contract fairly and understandingly made by the parties by inserting therein words, terms or conditions on which there was never a meeting of the minds. R. C. M. 1947, sec. 93-401-15. It is the duty of the courts to enforce contracts which the parties themselves have made and not to make new and different contracts for the parties or to make significant additions thereto and thus give to one or more of the parties, benefits and advantages on which the minds of the contracting parties have never met.

In 45 Am. Jur., Reformation of Instruments, sec. 8 at p. 588, it is said: "The court in recognizing the equity cannot make such a contract as it thinks the parties ought to have made or would have made, if better informed, as by inserting in the instrument important conditions which the parties never fully assented to. The court merely makes the instrument what the parties intended it to be."

Here the plaintiff grounds his action and seeks to have the contracts reformed solely "by reason of the mutual mistake of the plaintiff and defendant Marsh and said Tappa."

Reformation for mutual mistake presupposes a prior under-
 standing and agreement. It must be clear that the parties have come to a complete and mutual understanding. This is necessary; otherwise there would be no standard in accordance with which the writing could be reformed. Restatement of the Law of Contracts, sec. 504 at p. 969.

A sequence statement of reformation is this: There is a prior understanding of the parties; the parties execute a written contract; somewhere and sometime between the understanding reached and the actual creation of the written instrument, a mistake occurs. It occurs in reducing to writing the agreement

which the parties have intended. Obviously the alleged mistake must relate to something then in the contemplation of the parties. The fault sought to be corrected is that the executed written instrument does not reflect the actual and true understanding of the parties. This is a cardinal principal in the field of reformation for mutual mistake. Then, and only then, can the powers of equity be invoked to correct the mistake.

Plaintiff's case is premised on the proposition that it was his ▮▮ understanding with Marsh that the liquor licenses were to be returned to plaintiff at the end of the leasing period. The evidence, however, fails to sustain such proposition.

On his direct examination the plaintiff Sullivan testified:

"Q. Will you relate what those understandings were? A. Well, the property was to be returned to me as they received it."

Again, referring to the second written contract plaintiff testified:

"Q. And the lease, Plaintiff's Exhibit No. 2, is that the lease you entered into with Marsh? A. Yes.

"Q. Does that lease contain the same provisions as the other lease? A. Yes, I believe it does; yes.

"Q. It was just changed in the name. Is that the idea? A. It was just changed from Tappa, just left that out and Mr. Marsh's name was put in."

Concerning the liquor license, plaintiff testified:

"Q. Was he [Marsh], as far as he has said anything to you, interested particularly in the liquor license? Did he make any statements to you regarding the liquor license when he leased that property, as to whether he wanted that or not? A. No, he didn't but I think he wanted the whole business, the hotel and the bar the way it was, with the liquor license in there.

"Q. Was he particularly interested in the liquor license? A. Well, so much so that it was put in the lease that I would help him to get the liquor license, help him with his getting the license.

"Q. What was the understanding between you, if anything

regarding renewal of the license during the term of that lease? A. There wasn't any at all.''

. Plaintiff further testified:

''Q. Before you signed this lease, plaintiff's exhibit No. 1, which is the lease of May 27, I assume you read it, Mr. Sullivan, and looked it over? A. Yes.

''Q. You knew the contents of it before you signed and you had had considerable business experience before. A. Yes.

''Q. So you read the lease, I suppose, rather carefully. A. Well, I was in the hospital and you know how careful a fellow does when he is sick.

''Q. Well, you read the lease at that time and you thought it was all right and contained your understandings with Tappa and Marsh. A. With the understanding I had with them I figured it did.

''Q. Yes, you thought it did. A. Yes.''

Again plaintiff testified:

''Q. Now, before you signed the lease of July 12, plaintiff's exhibit No. 2, you read it? A. Yes.

''Q. At that time you were feeling pretty good and read it rather carefully? A. Yes.

''Q. As far as you know then Plaintiff's Exhibit No. 2 contained your understanding with Mr. Marsh. A. Yes, that is a fact.

''Q. Nothing was omitted. A. No.

''Q. Did you sign this before Mr. Sias also? A. Yes, I believe so; yes.''

As to the understanding of the parties concerning the liquor license at the time of signing the lease plaintiff testified:

' ''Q. When did you first discover that the lease didn't contain the alleged understandings you had with Mr. Marsh. A. Well, that was—I knew that from the start, that it never said anything about the liquor license.

''Q. Why did you sign it then, if you knew that it didn't contain that provision? A. Well, at that time, when the lease

was made Governor, there was no necessity for mentioning the liquor license; they were a dime a dozen every place."

The defendant Marsh testified:

"Q. Did you ever go to Mr. Sias or talk to him about what to put in the lease? A. No.

"Q. So far as you know then all of the information relative to the terms that were to be incorporated in this lease were given to Mr. Sias by Mr. Sullivan? A. Yes. * * *

"Q. Now, as I understand it, Mr. Marsh, the only conversation that you had with Mr. Sullivan relative to the terms contained in those leases was the conversation down at the veterans hospital here. A. That is all we ever had. * * *

"Q. Was there anything ever said in this conversation you had with Mr. Sullivan relative to licenses? A. No.

On cross examination Marsh testified:

"Q. Now, at the time there was no question about the number of liquor licenses in a given county or community was there? A. I don't think there was, no.

"Q. No. When Mr. Sullivan had leased those premises to you, you intended to give him back exactly what he gave to you. A. No, not the license.

"Q. That wasn't your intention at all. A. No, never was."

This court is called upon to ascertain if possible the intention of the parties. If a mutual mistake occurred in the transference of the understanding of the parties to writing, the writing may be reformed to reflect the true understanding. The presumption is that the writing contains the final agreement of the parties and expresses their real purpose and intent. To meet and overcome that presumption plaintiff was required to present clear, convincing and satisfactory proof. McNamer Realty Co. v. Sunburst Oil & Gas Co., 76 Mont. 332, 247 Pac. 166.

The general rule is that to obtain reformation the mistake must be mutual. R. M. Cobban Realty Co. v. Chicago, M. & St. P. R. Co., 52 Mont. 256, 157 Pac. 173; Hoskins v. Scottish Union & Nat'l Ins. Co.. 59 Mont. 50. 195 Pac. 837: Comerford v.

United States F. & G. Co., 59 Mont. 243, 196 Pac. 984; 45 Am. Jur., Reformation of Instruments, sec. 55, pp. 617, 618; 53 C. J., Reformation of Instruments, sec. 42, p. 928. The record before us fails to show any mutual mistake.

It is quite apparent that both Sullivan and Marsh fully understood and appreciated the terms and provisions of their written contract, each party discharging the obligations thereby imposed upon him throughout the five-year contract term.

It was not until a few weeks before the expiration of the term agreed upon that any question arose as to the terms of the contract and such question was raised by Sullivan after he had declined to extend or renew the contract and after Marsh had declined to transfer his right, title and interest in his licenses to Sullivan unless compensated therefor.

A retail liquor license issued by the state is a matter of privilege rather than of right. The privilege is personal to the licensee. The license is neither a right of property, nor a contract or contract right, in the legal or constitutional sense of those terms. Such liquor license does not run with the business conducted under the privilege it grants and is not an asset of it. It is neither "lands," "buildings," "improvements," nor "stock and fixtures." Light v. Zeiter, 124 Mont. 67, 219 Pac. (2d) 295.

As neither the contract of July 12, 1944, nor the contract of May 27, 1944, which it superseded, contained any provision for any renewal or extension of the five-year term nor any provision for a transfer by the licensee of the beer and liquor licenses upon the expiration of the contract term, and, as the parties at no time had agreed to either a renewal of the contract or to a transfer of the state beer or liquor licenses, the district court sitting as a court of equity was no more warranted in altering the written contracts and adjudging a reformation thereof that would require Marsh to transfer his licenses to Sullivan than in adjudging a reformation that would require Sullivan to renew the contract and give Marsh a new or additional term of lease on

the demised premises. Under the facts of this case the decree entered constitutes an abuse of discretion on the part of the trial court.

The evidence fails to sustain the trial court's findings of fact and its conclusions of law and decree are contrary to law. Accordingly, the decree is reversed and the cause is remanded to the district court with directions to set aside, vacate and strike the trial court's findings and conclusions and to enter judgment for the defendants and against the plaintiff.

Decree reversed with directions.

MR. CHIEF JUSTICE ADAIR and ASSOCIATE JUSTICE METCALF, concur.

THE HONORABLE W. W. LESSLEY, District Judge, sat in place of JUSTICE BOTTOMLY, disqualified.

MR. JUSTICE ANGSTMAN, dissenting:

I am not able to subscribe to the conclusion reached in the majority opinion.

I do not find in the record anything to justify the assertion made in the majority opinion that plaintiff had in view the matter of selling his stock of liquor and giving a lease on his hotel property upon the expiration of his state retail beer and liquor licenses (June 30, 1944).

As I read the record he decided to sell his stock of liquor and lease his property because he was unable by reason of sickness to operate the business and it was sickness and not the expiration date of his licenses that motivated his actions.

The lease was not made at the expiration date of his liquor licenses (June 30, 1944) but was made by written instrument of May 27, 1944.

The record shows that when Marsh and Tappa applied for a liquor license and a beer license on June 1, 1944, they were informed by the liquor control board that they must obtain an assignment of the liquor and beer licenses then held by plaintiff. To accomplish the intention of the parties plaintiff did execute

an assignment of the licenses on June 9, 1944, without any additional consideration than that appearing in the lease.

I think Judge Padbury was right in finding for plaintiff.

In ascertaining the intention of the parties to a contract it is proper to consider the subject matter of the contract and the purpose of its execution. Lee v. Lee Gold Mining Co., 71 Mont. 592, 230 Pac. 1091.

It is plain to me from the evidence including the lease and assignment of the liquor and beer licenses that defendant Marsh was taking over for the period of the lease the liquor business theretofore operated by plaintiff, and that at the expiration of the period of the lease defendant was to return to plaintiff the same liquor business.

There was no intention on the part of either plaintiff or defendant that defendant should speculate in or traffic in liquor licenses as such. They were simply incidental to the liquor business and it was contemplated that the entire business be restored to plaintiff at the expiration of the period of the lease. I think the court properly reformed the contract to make it specifically relate the intention of the parties, but I also think it was unnecessary to reform it because it already contemplated restoration by defendant at the end of the term of everything received from plaintiff incidental to the business.

Furthermore this court has held that a liquor license is applicable only to the premises for which it was issued. State ex rel. Jester v. Paige, 123 Mont. 301, 213 Pac. (2d) 441. I did not agree with the opinion in the Jester case, but it is the law in Montana, and I accept it, as such under the doctrine of *stare decisis*. State ex rel. Boulds v. Paige, 124 Mont. 353, 224 Pac. (2d) 141.

Under that ruling I think the liquor license passes with the change in the rightful occupancy of the premises much as an automobile license follows the ownership of the automobile, subject, of course, to the right of the liquor control board to pass upon the fitness of the new occupant of the premises. Brubaker

v. D'Orazi, 120 Mont. 22, 179 Pac. (2d) 538. This is the view I took in Light v. Zeiter, 124 Mont. 67, 219 Pac. (2d) 295, involving a somewhat similar case.

I think the judgment of the district court should be affirmed.

MR. JUSTICE FREEBOURN concurs in the dissenting opinion of MR. JUSTICE ANGSTMAN.