BOND, APPELLANT, v. BIRK, RESPONDENT.

No. 9075.

Submitted May 5, 1952. Decided August 5, 1952.

Rehearing denied August 21, 1952.

249 Pac. (2d) 199.

Mr. Daniel J. Korn and Mr. Hans Walchli, Walchli, Korn and Warden, Kalispell, for appellant.

Mr. Roger G. Baldwin, Baldwin & Baldwin, Kalispell, for respondent.

Mr. Walchli and Mr. Baldwin argued orally.

MR. CHIEF JUSTICE ADAIR:

This is a suit in equity for the cancellation of a deed executed by the plaintiff, Violet M. Bond, to her daughter, Mrs. Elizabeth Bond Birk, the defendant, and describing the plaintiff's dwelling house and home in Kalispell, Montana, and for a decree compelling the daughter to reconvey said property to her mother.

*The Pleadings.* The complaint alleges that on August 3, 1944, and for a number of years prior thereto, plaintiff had been the owner of and in possession of a described town lot and dwelling in the city of Kalispell; that on said date she executed a deed with the intent and purpose of keeping the deed at her home with her other valuable papers which instrument was to be recorded only upon and in the event of the plaintiff's death, providing the plaintiff had not in the meantime otherwise disposed of said property; that between August 3, 1944, and August 21, 1948, the defendant without the knowledge or consent of plaintiff took said deed and recorded it in the office of the county clerk and recorder of Flathead county; that plaintiff had no knowledge of such recording until November 16, 1949, when she went to the county treasurer's office to pay the taxes on her property and then learned that the property had that year been assessed to defendant bcause of the recording by her of said deed; that plaintiff has paid the taxes on the property

for many years prior to August 3, 1944, as well as at all times since said date, to and including the taxes for 1949 and that at all said times plaintiff has been and now is in possession and control of said property. The complaint also alleges that defendant never gave the plaintiff any consideration for the deed or the property.

The defendant's answer admits that between August 3, 1944, and August 21, 1948, defendant recorded said deed, but denies it was without the knowledge or consent of plaintiff; admits that the defendant neither gave nor paid plaintiff any consideration for said property but alleges that said deed was given to defendant by plaintiff ''as defendant's birthright as a child of her late father'' and also alleges that at such time defendant's sister Lorraine Hanchett, who operates a greenhouse in Kalispell was given a sum of money in greater amount than the value of the real estate in question and that said deed was delivered to defendant with no restrictions whatsoever. The answer denies all other allegations of the complaint.

Plaintiff's reply denies all the allegations of said answer and for an affirmative defense alleges that plaintiff at all times mentioned in her complaint had been and now is the true, lawful and sole owner of the property and in complete control and possession thereof; that defendant at no time has claimed or asserted any right or title thereto nor has defendant been in possession of or paid any taxes or made any improvements thereon and that defendant ought to be estopped from asserting any right, title or interest therein. The reply also denies that defendant had any socalled ''birthright'' in or to said property and further alleges that if defendant had any such right, the same was barred by sections 93-2607, 93-2504, 93-2505 and 93-2613. R. C. M. 1947.

The issues so presented were tried to the district judge sitting without a jury.

*The Evidence.* The plaintiff testified that she acquired the property involved by deed dated September 19, 1938, which deed was introduced in evidence. Plaintiff said she had never

sold or given such property to any one but that on August 3, 1944, she did execute a deed therefor, to the defendant, her daughter, whom she calls "Betty", which deed was introduced in evidence. This deed is the usual form of warranty deed with no reservations therein of any kind by the grantor and, while it bears date of August 3, 1944, the defendant did not cause it to be placed of record until August 20, 1948.

Plaintiff testified the deed to her daughter was drawn by attorney Dan Korn, who also acted as plaintiff's counsel during the trial of this case. On examination by her counsel plaintiff explained her reason for making the deed. She testified:

"Q. And did you have a conversation with me at that time as to your intent and purpose in making the deed? A. Yes, I did.

"Q. And what did you tell me you wanted done at that time? A. Well, I wanted to protect Betty by making the deed so she would have no court costs, have no trouble, and could acquire the property at the time of my death.

"Q. Were you living in Kalispell at the time this deed was signed by you? A. Yes, sir.

"Q. And what did I instruct you to do with it, or what to do with the deed after you left my office? A. You told me to put it for safe keeping with my papers.

"Q. And did you do that? A. I took it home.

"Q. Where did you put it? A. I put it with the papers at home.

"Q. And that was right after you signed this deed in 1944, is that right? A. Yes, sir.

"Q. When did you ever see that deed again after you put it with your papers in 1944? A. I never seen the deed any more.

"Q. Did you ever tell Betty, the defendant in this case, that you had signed such a deed? A. Yes, I did.

"Q. And did you at any time give her the deed? A. No, I didn't.

"Q. Did you deliver the deed to her at any time? A. No.

"Q. Did you ever authorize her to take the deed and record it? A. No, sir.

"Q. Did she ever ask you to give her the deed so she could record it? A. No, sir.

"Q. Did she ever talk to you about this deed afterwards? A. No."

Plaintiff also testified that Betty was married at the time plaintiff executed the deed and she thinks was then living in Missoula; that plaintiff first learned that the deed had been recorded when she got a tax notice in 1949 which was sent her by the Western Montana Building and Loan Association, to whom she had given a mortgage on this same property on March 24, 1947, for $4,000; that plaintiff has been in possession of the property ever since she acquired it on September 19, 1938; that she received the rent when part of the house was rented and paid the taxes to and including the year 1949, which payments were admitted by defendant's counsel; that upon discovering the deed had been recorded plaintiff went to her attorney, Mr. Korn, for advice; that he suggested there must be some mistake and that plaintiff write or call Betty, who then lived in Illinois, and also suggested that she send a deed to Betty for her to sign so as to return the property to plaintiff; that plaintiff sent such deed to defendant for the latter's signature but it was never returned and that plaintiff received no reply to her letter regarding such deed and defendant never made any explanation of why she refused to sign the deed so sent her; that plaintiff had also telephoned Betty and that the latter's husband answered stating that Betty was not there and that he did not know where she then was; that Betty's husband at that time knew what plaintiff wanted and that plaintiff again consulted her attorney who advised her to commence this action.

On cross-examination plaintiff testified that Betty was 26 years old in March 1950; that she was plaintiff's youngest daughter and she had been married several years. Plaintiff was further examined as follows: "Q. And you think she stole this

deed from you? A. Well, she got the deed—yes, she took the deed.

"Q. She stole it, is that right? Did she steal the deed? A. Yes, she took the deed.

"Q. When did she take it, Mrs. Bond? A. I don't know." Plaintiff also testified that Betty had been to Kalispell since the deed was executed; that defendant and her husband lived in Missoula and that they came to Kalispell for weekends following the execution of the deed and that undoubtedly after plaintiff signed the deed, Betty knew where plaintiff kept it.

On her redirect examination plaintiff testified there was a balance of about $2,900 still owing on the note secured by the mortgage on the property which mortgage was introduced in evidence, same being to the Western Montana Building and Loan Association dated March 24, 1947, and originally to secure an indebtedness of $4,000.

The defendant testified she was the daughter of plaintiff; that her nickname was "Betty"; that in July 1950, she had been married seven years and resided in Batavia, Illinois; that she had heard her mother's testimony about making said deed in attorney Korn's office on August 3, 1944; that such testimony is correct so far as she knows; that subsequent to August 3, 1944, the first she had seen of her mother was the last week in August of 1944 at Orchard Homes in Missoula where defendant was then living; that her mother arrived there in the afternoon while defendant was getting dinner; that defendant and her husband were then busy getting settled and decorating in their new home and that plaintiff agreed to stay over night; that the mother then walked around the house with defendant's husband and then came into the kitchen. Defendant further testified:

"Q. Betty, tell the judge why you remember this occasion so well, if you can, tell the story just what happened. * * * A. One of the reasons, my mother came into the kitchen and she called Bob to come in. He was in another room; he was there at the time and he came out. She handed me the deed.

She said, 'This is yours. We have everything settled with Lorraine.'

"Q. She handed you the deed? A. Yes, she handed me the deed.

"Q. What did she say about Lorraine? A. She said, 'This is yours. Everything is settled in Kalispell with Lorraine and Earl.' "

Defendant further testified that nothing was said as to when the deed could be recorded; that she looked at the deed, put it in her pocket and later placed it in a trunk which was then in the dining room and wherein defendant had other personal property; that the deed remained in this trunk and was there when the couple moved from Missoula to Havre at which time the trunk was put in storage so that defendant was unable to get the document for a year or so; that defendant filed the deed for record in August 1948 when she and her husband returned to Montana for a vacation; that she saw her mother in Butte and her sister in Kalispell; that her sister told her their mother had placed a mortgage upon the property and that she "was taken back and couldn't understand as she thought the deed her mother gave her was recorded;" that at that time defendant did not know anything about this recording business; that she then went to an attorney in Aurora, Illinois, whom she told about the mortgage and that he advised defendant to record the deed; that defendant had not paid the taxes on the property as her mother was using it, collecting the rent therefrom and paying the taxes; that defendant could not afford to take care of the taxes when her mother collected the rent; that at the time of the trial defendant was working for the Farmer's Electrical Company in Batavia, Illinois; that she had no previous knowledge that her mother had promised defendant would have an equal share in the property; that previous to the time her mother handed her the deed her mother had come to defendant and the latter's husband and attempted to have him interfere with defendant's sister and the sister's husband in the operation of the greenhouse in Kalispell because the mother thought they

were absconding with funds and that she consulted her attorney, Mr. Baldwin, who prepared a power of attorney appointing defendant's husband, which instrument was executed by her mother and introduced in evidence at the trial. This instrument was an ordinary form of power of attorney, giving defendant's husband authority to handle the business in connection with the operation of the Woodland Flower Shop and Greenhouse in Kalispell.

On cross-examination defendant testified that she and her husband lived in Missoula before they located at Orchard Homes in July 1944; that her mother gave her the deed in the latter part of August 1944, but gave her nothing else at that time; that defendant has never attempted to communicate with her mother since the question arose as to the propriety of recording the deed; that defendant moved to Illinois in 1945; that she was in Kalispell several days before leaving for Illinois and stayed in her mother's house; that her understanding was that her mother was dividing things and taking care of her sister and that the deed covered her share and that her sister got the greenhouse.

Defendant's husband, Robert Birk, testified that he had heard his wife's testimony; that when he and defendant were first married the plaintiff gave them some furniture but he did not remember just what it was; that plaintiff come to their house at Orchard Homes the last week in August 1944; that while there plaintiff was in the kitchen talking to his wife; that one of them called and he went to the kitchen and that the deed was then and there handed to his wife by her mother; that Betty handed the deed to him; that he examined it and returned it to his wife who put it in her apron pocket; that about a year later he saw the deed in a trunk which had been in storage; that at the time plaintiff handed the deed to defendant plaintiff mentioned that the difficulty in Kalispell had been straightened out and then said, "Here, this is yours."

On cross-examination Robert Birk testified he knew the deed had been put in the trunk and that he examined it in 1945

when the trunk was shipped to their home in Idaho Falls; that he is a territorial supervisor for the J. B. Sampson Company; that he has had experience in dealing with property and knew what a deed was; that this one occasion was the only night the plaintiff stayed at their residence in Orchard Homes.

In rebuttal plaintiff testified that she had heard the testimony of defendant and her husband; that plaintiff had never stayed overnight at their home in the Orchard Homes district, but that prior to the, time defendant had moved to such district, and while defendant was living in a four-room house in Rattlesnake Gulch she had sometimes stayed at defendant's home and that on one occasion plaintiff there gave defendant some war bonds; that plaintiff was at Orchard Homes on only one afternoon at which time defendant had telephoned her to come there and assist in searching for a wrist watch which the mother had given her and which defendant thought she had lost in a five-acre field, being a part of the new home which defendant and her husband had just purchased; that in response to such call plaintiff came down and assisted in the search but without success.

Plaintiff also testified:

"Q. You recall now your daughter testified, and her husband, while you were at her home in Missoula—that Orchard Home place—the latter part of August, 1944, you gave your daughter a deed. You recall giving a deed? A. No, sir, I never gave her a deed.

"Q. Did you give her anyhing else at that time? A. I gave her furniture.

"Q. Do you recall saying anything to your daughter Betty at that time concerning the making of a deed? A. Yes, I told Betty, I always told her when I died the home was going to be hers. I told her I had the deed made for her with that provision, when I died the home was hers."

As to the execution of the power of. attorney in favor of defendant's husband the plaintiff testified that her daughter Lorraine and the latter's husband, Earl, were planning to leave and

that defendant and defendant's husband Robert were going to take over the greenhouse; that plaintiff then consulted attorney Baldwin who drew such power of attorney on July 21, 1944, so that defendant's husband could take over the operation of the greenhouse; that plaintiff's own husband turned the greenhouse over to plaintiff to operate some three years prior to his death on March 5, 1940, and that plaintiff's daughter Lorraine and her husband Earl had helped plaintiff operate the greenhouse ever since it was so turned over to plaintiff; that at the time plaintiff executed the deed to Betty on August 3, 1944, plaintiff, also on that same date, entered into an agreement with her daughter Lorraine and the latter's husband Earl to operate the greenhouse; that when plaintiff gave the power of attorney to defendant's husband she did not understand that he was to go to the greenhouse or to go through the books and affairs thereof for the purpose of checking up on Lorraine.

As to her agreement with Lorraine and Earl, plaintiff testified:

"Q. What was your purpose in making it then—what did you have in mind? A. Well, Lorraine and Earl had run it ever since dad was sick, and they had taken care of it, and she did not get any wages, which is the truth of it. She said, 'Mom, unless we have something to show for all the work we have put in here in all these years, Earl and I are going to pull out and get something.' She said, 'We are not getting younger, and now is the time for us to get out instead of building up something that we won't have,' and I said, 'Lorraine,'—I begged her to stay.''

The agreement dated August 3, 1944, was introduced in evidence. It is signed by plaintiff, as party of the first part, and by Lorraine and Earl C. Hanchett, as parties of the second part. Therein the second parties agreed to take over the Woodland Greenhouse and Woodland Flower Shop in Kalispell, Montana, the instrument reciting that plaintiff owned one-half interest in such property and on account of ill health she is desirous of retiring from active participation in the business and that the

second parties are desirous and willing to assume the responsibility of conducting such business.

The agreement further states: ''1. The party of the first part hereby agrees to execute and deliver in escrow with the Conrad National Bank of Kalispell, Montana, a warranty deed conveying to the parties of the second part all right, title and interest in and to the following described property situated in the City of Kalispell, Flathead County, Montana, to-wit:'' describing the real estate, and also agreeing to execute a bill of sale transferring all of the party of the first part's interest in all furnishings, furniture, fixtures, equipment and tools used in connection with the operation of said greenhouse and further provided: ''and said Bank is hereby instructed and directed to deliver said deed and Bill of Sale to the parties of the second part immediately upon the death of the first party, without any payment or consideration of any kind other than the fulfillment of this contract by the second parties by the payment of the sum of One Hundred Dollars ($100.00) per month to the first party during the period of her natural lifetime, unless such payment is hereafter at any time expressly waived by said first party.'' The parties of the second part therein agreed to pay to the first party $100 per month during the remainder of her natural life unless expressly waived by her.

The instructions given plaintiff by her attorney as to what plaintiff should do with the deed which he had drafted for her corroborated plaintiff's testimony that she never stayed overnight at defendant's house at Orchard Homes and that she had never delivered the deed to the defendant then or at any other time.

The admitted facts that the plaintiff's residence and the greenhouse were jointly mortgaged prior to August 1944, for $5,300 and that thereafter, on March 24, 1947, plaintiff executed a second mortgage on the residence alone for $4,000 lends further and strong support to plaintiff's testimony that she at no time delivered the deed to defendant.

Defendant's sister, Lorraine, also testified in rebuttal that

her mother had never questioned her or her husband's handling of the greenhouse business or their honesty in the affairs of such business and that after she learned that the deed from her mother to Betty had been recorded she too attempted to get in touch with Betty by telephone and heard Betty say to the telephone operator, "I don't care to talk to her." On her cross-examination Lorraine testified: "Q. You don't like your sister. A. Yes, I do.

"Q. You think she is a liar? A. I am convinced she has lied today."

After a careful review and consideration of the facts as ██ disclosed by the evidence in this case we are of the opinion that such evidence clearly preponderates against the contention of the defendant that said deed was delivered to her by her mother at defendant's home on August 21, 1944. We are further of the opinion that such contention is directly contradicted by the mother's testimony and that it is corroborated by the other material facts disclosed by the record, such as plaintiff's agreement with defendant's sister regarding disposition of the greenhouse;—the fact that the deed to defendant made no reference to the prior existing mortgage which plaintiff had placed thereon and the fact that long after executing the deed the plaintiff, on December 26, 1947, gave a new mortgage on the property for $4,000. The defendant's testimony was also contradicted by that of her sister Lorraine who testified that she liked her sister but she was convinced defendant had lied all through this case.

This appeal presents a question similar to that decided in the case of Cleveland-Arvin v. Cleveland, 123 Mont. 463, 215 Pac. (2d) 963, 965, where this court, in reversing a judgment for the plaintiff daughter, who claimed certain property under a deed from her mother, the defendant, there said: "There is no instrument in writing creating a life estate in the defendant.

"Under the pleadings and evidence the plaintiff either received an unconditional fee simple estate or she received nothing. If the deed was delivered to the plaintiff by the defendant with

the intention that it take effect on the death of defendant then there was no delivery.

"The court's finding that a deed was delivered is completely inconsistent and contradictory with the decree that the defendant have a life estate. * * *

"It is true that the plaintiff testified that there was a delivery of the deed but taking all the circumstances together it is apparent that Mrs. Cleveland was putting her daughter in the same position with respect to the property that Mr. Cleveland had occupied during his lifetime. Mrs. Cleveland never delivered the deed to the plaintiff and retained possession of the instrument itself. The plain intent of the parties was that the deed would be effective only after Mrs. Cleveland's death. And this is obviously the view that the trial judge took for that is the only explanation of the inconsistent and self-contradictory findings of fact and decree."

In their brief in the instant appeal counsel for the defendant concede the correctness of our decision in the Cleveland Case, supra, but urge that in the instant case the trial judge erred in holding the plaintiff had a life estate and assert that "the defendant was entitled to a judgment giving her a clear title to the property in question with no reservations whatsoever."

Since the defenses of estoppel and the Statute of Limitations pleaded in the plaintiff's reply to defendant's answer were not passed upon by the trial court nor were they briefed for this court we shall not consider them on this appeal.

For the reasons above stated the judgment of the trial court is reversed and the cause is remanded to the district court with instructions to enter a decree for the plaintiff, Violet M. Bond, in accordance with the prayer of her complaint.

MR. JUSTICES BOTTOMLY and ANGSTMAN, concur.

MR. JUSTICE METCALF, dissents.

MR. CHIEF JUSTICE ADAIR:

The defendant has petitioned for a rehearing upon three alleged grounds.

First, the defendant claims that certain facts material to the decision were overlooked by this court and that as a result of such oversight the first sentence on page 12 of this court's typed opinion herein is not supported by the record on appeal. The sentence so challenged is not at all material to this court's decision herein but notwithstanding we have eliminated the entire offending sentence by striking same from the opinion.

Next, the defendant urges that certain questions decisive of the case submitted by counsel were overlooked by this court in making its decision herein, but we do not find that any such question submitted by counsel has been overlooked by this court in making its decision.

Finally, the defendant challenges the jurisdiction of this court to reverse the trial court after reviewing the evidence in the record on appeal and determining that such evidence preponderates against the party prevailing in the trial court asserting that such procedure and decision are in conflict with certain controlling decisions of this court. The provisions of R. C. M. 1947, sec. 93-216 are controlling rather than the various decisions cited by defendant.

*Jurisdiction.* "Jurisdiction as applied to courts is the power or capacity *given by law* to a court to entertain, hear and determine the particular case or matter. * * * The kind of authority that is judicial in its nature relates to and acts upon the rights of person or property not created by this authority but existing *under the law*. * * * Judicial power is exercised by means of courts which are the mere creations and instruments of the law, and independent of *the law* the courts have no existence. *The law* precedes the courts. *The law* governs the courts.'' State ex rel. Bennett v. Bonner, 123 Mont. 414, 214 Pac. (2d) 747, 753.

*The law.* "Law is a solemn expression of the will of the supreme power of the state." R. C. M. 1947, sec. 12-101.

264

"The will of the supreme power is expressed: 1. By the constitution; 2. By statutes." R. C. M. 1947, sec. 12-102.

"The organic law is the constitution of government, and is altogether written. Other written laws are denominated statutes. The written law of this state is therefore contained in its constitution and statutes, and in the constitution and statutes of the United States." R. C. M. 1947, sec. 93-1001-9.

This particular appeal is from a decree entered in the district court of Flathead county in a *suit in equity*.

The Constitution of Montana provides: "The appellate jurisdiction of the supreme court shall extend to all cases at law and in equity, *subject, however, to such limitations and regulations as may be prescribed by law.*" Art. VIII, sec. 3.

R. C. M. 1947, sec. 93-215 provides: "The appellate jurisdiction of the supreme court extends to all cases at law and in equity."

The legislature of this state has enacted and prescribed by law certain valid limitations and regulations governing appeals to this court in equity cases.

R. C. M. 1947, sec. 93-216, so far as here pertinent, provides: "In equity cases * * * the supreme court shall review all questions of fact arising upon the evidence presented in the record * * * and determine the same, as well as questions of law, unless, for good cause, a new trial or the taking of further evidence in the court below be ordered". This statute is valid. Its provisions are constitutional. Finlen v. Heinze, 32 Mont. 354, 380, 80 Pac. 918. It is the law of this jurisdiction and, as such, binding upon the courts and litigants alike. The reluctance of an occasional judge to abide by and apply the foregoing mandates of the legislature neither repeals nor changes the statute.

"In the construction of a statute * * * the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted * * *". R. C. M. 1947, sec. 93-401-15.

On appeals to this court in equity cases and in matters and

▇▇ proceedings of an equitable nature the written law of this state imposes upon this court the duty to review all questions of fact arising upon the evidence presented in the record and determine the same, as well as questions of law, unless, for good cause, a new trial or the taking of further evidence in the court below be ordered. On this particular appeal this court complied with the statute and performed the duty so imposed upon it as it was directed and empowered to do.

In Bordeaux v. Bordeaux, 32 Mont. 159, 167, 80 Pac. 6, 8, this court, in construing the above law, quoted with approval from the supreme court of Nebraska as follows: " 'Moreover, the court is instituted to review causes, and the right to resort to it for that purpose is guaranteed by the Constitution. It has no right to renounce its functions. If, giving due weight to every advantage possessed by the trial court in the particular case, it is satisfied that a finding is clearly wrong, it should set such finding aside, notwithstanding there may be some competent evidence in support thereof; otherwise it has not fulfilled its duty of reviewing the finding when properly challenged.' ".

In State ex rel. United States Fidelity & Guaranty Co. v. District Court, 77 Mont. 594, 599, 251 Pac. 1061, 1062, this court said: "It has long been the custom of courts in reviewing the decrees in equity cases where all of the facts were presented on an appeal, and showed that the cause was ripe for an ultimate decision, to make such disposition of the case as the court below ought to have made." Compare: State ex rel. Nagle v. Naughton, 103 Mont. 306, 311, 63 Pac. (2d) 123, 125, and cases there cited; Miller v. Miller, 121 Mont. 55, 71, 190 Pac. (2d) 72; Hart v. Barron, 122 Mont. 350, 362, 204 Pac. (2d) 797, 804; Higby v. Hooper, 124 Mont. 331, 352, 221 Pac. (2d) 1043, 1053; Sullivan v. Marsh, 124 Mont. 415, 420, 225 Pac. (2d) 868; Sanders v. Sanders, 124 Mont. 595, 596 and 601, 229 Pac. (2d) 164, 167; Docotovich v. Docotovich, Mont., 229 Pac. (2d) 971, and State ex rel. Harrison v. Deniff, Mont., 245 Pac. (2d) 140. Also see Yarbrough v. Bellamy, 197 Okl. 493, 172 Pac. (2d) 801.

Lacking in merit defendant's petition for rehearing is denied and remittitur will issue forthwith.

MR. JUSTICES BOTTOMLY and FREEBOURN, concur.