*536 MR. JUSTICE SHEEHY
dissenting:
I disagree with the holding in this case.
The majority opinion goes against its own statement of facts. It translates a purported ambiguity in a statute authorizing counties to reserve oil and gas interests into a contract between the County and Shields in 1933 that is unambiguous as to a mineral reservation. To repeat the reservation in the 1933 contract:
“. . . vendor [County] reserves to itself and its successors an undivided two and one-half percent of all oil, gas and other minerals lying in, under and beneath the premises hereinbefore described. ...” (Emphasis added.)
As the majority sets out in its statement of facts “[all] parties agree that the above language created a mineral reservation.”
The major force upon which the majority relies in changing an outright, plain mineral reservation into a royalty reservation is the holding in Superior Oil Co. due to inadequate legal research into that case, and the majority hopes, perhaps, to tilt the legal balance in favor of their opinion by associating the name of Judge Jameson in their behalf. (This method is called “tilt-bv-association”.) The trouble is the majority did not read Judge Jameson far enough as to what Superior Oil Co. held, nor look at the applicable statutes.
There was no contract for deed shown in the Superior Oil Co. case. The decision turns upon the language in a deed from Richland County to a transferee, in which the following reservation was set out:
“Further reserving unto said grantor [County] six and one-fourth (6‘/t%) percent of all minerals contained in and hereafter mined, produced, extracted or otherwise taken from the above described property.” 307 F.Supp. at 85.
The quiet title action in the Superior Oil Co. case resulted in a decree recognizing the following interest:
“All of the above described property being subject to a reservation in and to Richland County, Montana, of six and one-fourth (6%%) percent of all minerals contained in, mined, produced, *537 extracted or otherwise taken from said lands; ...” 307 F.Supp. at 85.
Contrast, if you will, the language contained in the deed and quiet title decree in the Superior Oil Co. case with the language contained in the 1933 contract for deed above quoted, and also with the language in the quiet title decree in this case which stated:
“. . . A. D. Shields, is the owner, seized in fee and entitled to the possession of the following described real property . . . [lands described] excepting and reserving to the said defendant Mussel-shell County, Montana, 2lh% of all oil, gas or other minerals lying in, under and beneath [the described land] ...”
“. . . That the defendants . . . have no right, title or interest whatsoever in said premises . . . save and except the reservation of the mineral rights to the said Musselshell County, Montana . . .
“ . . . That upon the payment of the said balance by the plaintiff, the said defendant, Musselshell County, Montana execute and deliver a deed to the plaintiff, conveying the entire legal title, as well as the equitable title to the said lands, and that the defendant, Musselshell County, Montana be thereafter perpetually enjoined from any manner interfering with the plaintiff’s title to or possession of the said premises or any part thereof except as to the reservation of oil, gas and other minerals hereinbefore set forth.” (Emphasis added.)
The federal judge in Superior Oil Co. considered many factors in determining that the deed and quiet title action with which he was faced constituted a royalty interest and not a mineral interest. He did not say in that opinion that the ambiguity in a statute constituted an ambiguity in a contract between parties. He gave critical emphasis to the absence of the language “in, under or upon” in the Superior Oil Co. deed and quiet title action reservation. He said:
“Many factors may be considered in determining whether a mineral or royalty reservation is intended. Of primary importance is the use of the term ‘in, under or upon’ as indicating a mineral interest and ‘produced and save’ as indicating a royalty interest. *538 The Montana court is consistent with a majority of the jurisdictions in holding that these phrases are the most significant guides to the parties’ intentions ...” 307 F.Supp. at 90. (Emphasis added.)
The critical term “in, under or upon” is contained in the reservation of minerals in the 1933 contract for deed between Musselshell County and Shields and in the quiet title action in 1943, determining the effect of that contract. There can be no ambiguity as to what was reserved. It was purely and simply a mineral interest.
The deductive process upon which the majority opinion depends therefore is that the contract between the County and Shields was not ambiguous; a statute was ambiguous; therefore, the County-Shields contract was ambiguous. By the same kind of deductive reasoning, we can prove that any cat has ten tails: No cat has nine tails; any cat has one more tail than no cat; therefore any cat has ten tails.
It is significant to me and I think the majority has not considered that in 1933 when the Musselshell County-Shields contract was executed, there was no statute authorizing or not authorizing counties to reserve minerals or royalties in transfers of unredeemed tax title lands. The first such authorization for counties came with the adoption in 1935 of Ch. 154, Laws of 1935. Section 2 of that Act became section 4481.2, R.C.M. 1947, which Superior Oil Co. found to be ambiguous. The whole of that Act refers to mineral reservations, and in no place mentions royalties. Of particular significance, however to this case are the provisions of section 4 of the 1935 Act which provided:
“Section 4. All mineral reservations heretofore made by counties in this state, whether the same are of a greater percentage than is herein fixed, or not, and all agreements in connection with such reservations, heretofore made, whether in conformity with this act or not, are hereby ratified confirmed and validated.” Section 4, Ch. 154, Laws of 1935. (Emphasis added.)
The 1933 executory agreement for an unambiguous mineral reservation between Musselshell County and Shields was validated by the Montana legislature in 1935 or my cat has ten tails. Again, *539 this validation statute was not before the federal court in Superior Oil Co., supra, because the deed in that case was executed in 1940.
The 1935 validation statute brings us to the res judicata issue and the quiet title decree, which the majority dismisses as “not particularly significant.” On the contrary, the quiet title decree is of decisive significance. It determined in a judgment which became final that the interest of Musselshell County was a 2Vz percent mineral reservation and it directed the County when the purchase price had been paid, to deliver a deed to Shields with such a mineral reservation in it. The County has unexplainedlv failed to carry out the direction of the District Court, when it issued the deed in this case, possibly because in 1944, Roland V. Colgrove was the Musselshell county attorney and not A. G. McNaught, who was the county attorney at the time of the quiet title action.
The effect of the quiet title decree can not be avoided on the ground that whether the County reserved a royalty interest instead of a mineral interest was not litigated, because there could be no such issue. The language of the contract was unambiguously a mineral reservation; the contract had been given legislative blessing through a validation statute. Any attempt by the Musselshell county attorney in 1943 to raise an issue as to whether the 1933 contract stated a royalty reservation rather than a mineral reservation would have been frivolous. It is plain that such an issue could not have been litigated because no such issue existed.
The 1943 quiet title decree is therefore res judicata as to the purport and meaning of the mineral reservation, and as to the duty of the County to deliver a deed with a mineral reservation. If that be not true, there is no such rule of law as res judicata.
Where does all this leave the majority, whose opinion is premised upon the supposition that the 1933 contract between the County and Shields attempted to follow a code section before its enactment and that Ch. 171, Laws of 1941 (which has no application to the Shields contract) affords a “reasonable explanation” for the change to a royalty reservation in the Shields deed from the *540 mineral reservation provided in the contract? They are in the position of an oil driller pumping a hole drilled in granite — there is not oil there.
Clearly and convincingly, this record establishes that Musselshell County and Shields contracted for a mineral reservation, and that the District Court decreed a mineral reservation be delivered to Shields. When the deed was delivered to Shields in 1944, it contained a royalty reservation. On the agreed statement of facts before us, there is nothing that gives any clue that the parties changed their intention, contracted otherwise, or knew that the deed did not reflect their intention expressed in the contract and the quiet title decree. Any statement that they did change their intention, or their contract, would be sheer speculation on our part since we have only the agreed statement of facts to go on. It is only if merger by deed applies that there could be any justification for holding in favor of the County on the royalty reservation. The majority opinion glides by merger by deed, as though it rigidly applies here. This is not my view of the law.
Merger by deed, denominated a doctrine by some, is a broad statement that the grantor in a deed has completed the contract for deed even though he may not have fully performed. Bv finding a merger in the deed of all prior agreements between the parties, written or unwritten, courts have exonerated grantors from all legal responsibility for unperformed promises in the contract for sale. Through merger, in its purest form, the grantee in a breached contract, by accepting the deed, loses all right of rescission or cancellation or suit for damages occasioned by the breach. This is the result apparently accepted by the majority in reversing the District Court.
Merger bv deed, as a legal concept, is so drastic that exceptions to it have grown up which are as old as the concept itself. Merger does not apply to agreements collateral to or independent of the contract for sale. Bull v. Willard (N.Y.1850), 9 Barb. 641, 645. It does not apply where the omission in the deed is the result of mistake, accident or fraud. See, Union Producing Co. v. Sanborn *541 (E.D.Texas 1961), 194 F.Supp. 121, 126; Stevens v. Vail Associate, Inc. (1970), 28 Colo.App. 344, 472 P.2d 729.
Professor Allison Dunham insists, in Merger By Deed, 10 Ga.L.Rev. 419, 420, 421 (Winter 1976), that the “doctrine” appears in the Restatement of Law of Contracts, § 413 (1935), through the pervasive influence of Professor Williston; but that Professor Corbin suggests that there never was such a “doctrine” (Dunham, citing 3A Corbin, Contracts, § § 586, 587, 604.) Professor Dunham also points to the provisions of the Uniform Land Transactions Act (UTLA 1975), which repeal the doctrine of merger by deed ((UTLA) has not been adopted in Montana), and to the provisions of the Uniform Commercial Code (UCC) which expressly rule out merger in contracts to sell goods. Section 30-2-607(2), MCA:
“. . . acceptance does not of itself impair any other remedy provided by this chapter for nonconformity.”
Bull, supra, the 1850 case, attempts to establish merger by deed as to promises concerning “title, possession, quantity, and emblements,” holding these areas to be foreclosed by the grantee’s acceptance of the deed. Again, Professor Dunham, op. cit., supra, at 443, notes the many exceptions. See also, Comment, Merger of Land Contract in Deed, 25 Albany L.Rev. 122 (1924).
Montana has not heretofore expressly adopted merger by deed, though it has been noted in dictum. See, Schillinger v. Huber (1957), 133 Mont. 80, 87, 320 P.2d 346, 348, (discovery of error and acquiescence preventing reformation of a deed); Sullivan v. Marsh (1950), 124 Mont. 415, 425, 225 P.2d 868, 872, (reformation denied, mutual mistake not supported in absence of a prior contrary agreement); Voyta v. Clonts (1958), 134 Mont. 156, 328 P.2d 655 (reformation denied, where evidence failed to show the instrument did not reflect the actual agreement of the parties). If merger by deed does apply in Montana, it is not as broad and as absolute as some abbreviated statements make it out to be. Its statutory embodiment seems to be section 28-2-905, MCA, which provides that “when the terms of an agreement have been reduced to writing, it is to be considered as containing all of those terms.
*542 ...” Yet the same statute sets forth exceptions, including “mistake or imperfection of the writing put in issue by the pleadings.” See, section 28-2-905(1 )(a), MCA. Land contracts enjoy no special statutory exception and are-to be interpreted as any other contract so as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. Section 28-3-301, MCA.
Even if merger by deed applies, therefore, the court should search for the intention of the parties in determining rights under a deed. The burden of the parties seeking to set aside plain and unambiguous terms in the deed as contra to the actual intention of the parties is by clear, convincing and satisfactory proof. Sullivan v. Marsh, supra; Voyta v. Clongs, supra. Once that burden is met, the duty of the court is to enforce the true contract and not to make a new contract nor to perpetuate or make final a contract only partially or imperfectly performed. In so doing, the court would merely be reenforcing the reasons for the many exceptions to the concept of merger by deed.
In determining the true intention of the parties, the Court must place itself as nearly as possible in the position of the contracting parties, and their intent will be ascertained in the same manner as with any other contract. See, Szabo v. Superior Court (1978), 84 Cal.App.3d 839, 148 Cal.Rptr. 837; section 28-3-301, MCA. If we are going to adopt the rule of merger by deed in Montana, we should at least restate the rule to say that the concept will control except where the intentions of the parties are otherwise or where the stipulations of the contracts sought to be enforced are collateral to the functions performed by the deed. Carsek Corp. v. Stephen Sehifter, Inc. (1968), 431 Pa. 550, 246 A.2d 365.
The intention of the parties here should be determined from the instruments presented in the agreed statement of facts. The District Court had before it, as we do now, (in equity cases, we review all questions arising upon the evidence presented in the record, section 3-2-204(5), MCA) a contract for deed providing for a mineral reservation, and a deed providing for a royalty interest. If these two *543 instruments were all we had, we might consider the evidence evenly balanced. The overbalancing factor, however, is the quiet title decree which not only determined that the parties had contracted for a mineral reservation, but ordered the County to deliver a deed with the mineral reservation in it. The quiet title decree is a determination by an outside agency with full authority to act that the true intention of the parties to the 1933 contract for deed was for a mineral interest reservation. The language of the contract for deed and the determination of the rights of the parties in the quiet title action, taken together, are clear, convincing and satisfactory proof that the executed deed does not speak the true intention of the parties. Moreover, to hold that the executed deed controls, we would have to assume something that does not appear in the agreed statement of facts: that sometime between the date of the quiet title decree and the execution of the deed, the intention of the parties changed and the new agreement was made. Absent direct evidence, it is as easy to assume that the executed deed is the result of accident or of a scriveners mistake as it is to assume that the intention of the parties had changed. It is merely a resort to speculation.
The defendants contend that since the deed was executed and delivered after the quiet title decree that the deed is not subject to the res judicata application of the quiet title decree, citing Brannon v. Lewis and Clark County (1963), 143 Mont. 200, 387 P.2d 706. In Brannon, the plaintiff brought a quiet title action to certain lands in Lewis and Clark County and obtained a quiet title decree in 1950. Unknown to the plaintiff and the County, the lands to which the title was quieted were occupied in part by a highway which passed diagonally through the lots in issue. The plaintiff discovered the problem when she sought to sell the real property in 1960 and was advised that the real property had no real value because of the location of the paved highway. She commenced action in 1961 against Lewis and Clark County for trespass for the maintenance of a highway across her land. Summary judgment was granted against her, adjudging that the County had obtained a prescriptive right to the land as a highway and easement following the quiet title decree. This Court upheld the summary judgment.
*544 Under the ruling in Brannon, it might be possible here to assume that following the quiet title decree new circumstances arose, or new agreements were made, which led to the execution of the deed providing the royalty interest to the County. There is evidence of prescriptive rights accruing after the quiet title decree Brannon. Under that possibility, however, defendants run against the same barrier of proof that faces them in connection with merger by deed. Unless we guess, speculate or assume that some such change did occur, we have no evidence under the agreed statement of facts which can justify any ruling except that the order quieting title, issued by the District Court, remains in full force and effect.
That the County allowed a default judgment against it in the quiet title action is not a sufficient legal excuse later to avoid the conclusive effect of the default judgment. Friedrichsen v. Cobb (1929), 84 Mont. 238, 275 P. 267.
I come now to the agreement of February 28, 1977, executed some 34 years after the deed from the County to Shields, and entered into between Musselshell County and the present landowners of the deeded lands. McSweyn is not a party to the agreement of February 28, 1977, which was executed 5 months after McSweyn acquired the oil and gas leases from Musselshell County, and 25 days after McSweyn filed this lawsuit for a declaration as to the validity of his leases. The agreement of February 28, 1977 should have no effect therefore as to McSweyn.
The majority opinion places great store upon the February 28, 1977 agreement, contending that by the agreement, the “[c]ounty and all other parties in 1977 agreed that the 1944 deed reserved a royalty.” Of course they did. There is no disupute in the record or between these parties that the 1944 deed was a royalty reservation, and not a mineral reservation. What is important is that the agreement of February 28, 1977, between the County and the present landowners, was an arms-length agreement wherein the parties settled their conflicting differences as to whether the County was entitled to a mineral reservation or a royalty reservation under the Shields deed or other deeds held by the present landowners.
*545 The pertinent parts of the February 28, 1977 agreement are these:
“. . . WHEREAS, at one time the County acquired all of the above described real property for delinquent taxes and subsequently conveyed the Tract I property to one A. D. Shields and the Tract II property to John P. McClearv. Said transfers were made by virtue of contracts for deed to the purchasers set forth above.
“WHEREAS, when the County entered into contracts on the above described real property, certain reservations were made whereby the County made mineral reservations as set forth below. When the deeds were placed of record after complete performance by the purchasers under the contracts for deed, the County of Musselshell made royalty reservations in the deeds. The various royalty reservations are set forth below.
“ . . . WHEREAS, the parties hereto are in disagreement as to the interest of the County in the above described property. The parties hereto are desirous of settling such difference and settling the County’s interest in the above described property; and the parties hereto mutually agree that where the deeds from the County to the various purchasers show that there was a 2 Vi percent royalty, that said royalty interest be considered to be a 2 percent interest, and whenever the County reserved a 6‘A percent royalty in the above described property that said interest be considered to be a 4 percent royalty interest. Furthermore, the County makes no claim to any mineral interest in the above described property, and makes claim only to royalty interest as above set forth.
NOW THEREFORE, for and in consideration of the sum of ten and no/100 ($10.00) dollars and other good and valuable consideration, and in full and complete settlement of the County’s interest in and to the above described property, the parties hereto by these presents grant, bargain, sell, convey and confirm so much of their interest in and to the above described property that the County’s sole and only interest is the following described royalty interest:
*546 “[2 percent royalty interest in the lands concerned with the case at bar]
“This indenture is made for the purpose of conveying unto the County the . . . [royalty] free and clear of all costs of all oil, gas and hydrocarbons and other minerals produced and delivered in pipelines or otherwise produced and marketed from the above described premises, and this indenture is further made for the purpose of the County renouncing and transferring to all of the other parties to this instrument any and all other claim they may have to any of the above described property ...”
It is clear from the terms of the agreement that instead of that agreement being a declaration of the parties as to what their intentions were in 1944, it is instead an arms-length agreement settling conflicting claims between the parties, but without the presence or assent of McSweyn.
The present landowners stand to gain, under the majority opinion of this case, by virtue of the agreement of February 28, 1977. Under the decision of the District Court, if we were to uphold it, the royalties under the McSweyn leases would be divided as follows:
Percentage distribution of oil
Assuming 2.5 % County Mineral Reservation
Lessee-producers 85.00 %
Landowners 12.5
McSweyn 2.125
County 0.375
100.00%
Under the majority opinion, the distribution of oil proceeds will be as follows:
Percentage of distribution of oil
Assuming 2.5 % Royalty Reservation and the Agreement of 2/28/77
Lessee-producers 85.00%
Landowners 13.00
McSweyn 0
County 2.00
100.00%
*547 The agreement of February 28, 1977, should have no bearing under considerations of equity or otherwise as to the disposition of this case.
I should have no difficulty, if the majority otherwise agreed with me, in showing that estoppel, laches and waiver constituted no bar to the validity of the McSweyn leases. Because the majority do not reach those issues, I reserve a discussion, I trust to a future time. I would uphold the judgment of the District Court determining that the McSweyn oil and gas leases of Musselshell County were valid and subsisting.