LOU I. VOYTA, Executrix of the Estate of JAMES CONNORS, Deceased, Appellant, *v.* W. H. CLONTS and JENNIE E. CLONTS, Respondents. LOU I. VOYTA, Appellant, *v.* R. G. AVERITT and RUTH C. AVERITT, Respondents. LOU I. VOYTA, Appellant, *v.* W. H. CLONTS and JENNIE E. CLONTS, Respondents.

Nos. 9588 - 9590.
Submitted January 29, 1958. Decided August 13, 1958.
328 Pac. (2d) 655.

John W. Bonner, Helena, for appellant.

Hauge & Hauge, Havre, for respondent. Oscar C. Hauge, Havre, argued orally.

MR. CHIEF JUSTICE HARRISON:

This is an appeal by each of the plaintiffs, James Connors, Harry E. Voyta and Lou I. Voyta, from the final decrees entered in favor of the defendants, W. H. Clonts, Jennie E. Clonts, R. G. Averitt and Ruth C. Averitt, by the district court of the twelfth judicial district of the State of Montana, in and for the County of Hill.

Following the taking of the appeals this court was notified in writing that the appellant, Harry E. Voyta, had died and that Lou I. Voyta had succeeded to all the right, title and interest in and to the properties of the appellant, Harry E. Voyta, involved in this cause. In accordance with Rule XVII of this court, appropriate order of substitution was made and entered herein. Likewise this court was notified in writing that the appellant, James Connors, had died and that Lou I. Voyta is the duly qualified and acting executrix of his estate. In accordance with Rule XVII of this court, appropriate order of substitution has been made and entered herein.

The plaintiffs, Harry E. Voyta and James Connors, on and prior to December 1, 1951, owned certain lands in Hill County and listed the same for sale with a realtor of Great Falls, Montana, who advertised the lands for sale in the Great Falls Tribune. The defendant, W. H. Clonts, then a resident of Texas, now a resident of Hill County, Montana, read the advertisement, and accompanied by his son-in-law, R. G. Averitt, came to Great Falls on November 30, 1951, to investigate. The realtor took them to Hill County and showed them the land on December 1, 1951. They returned to Great Falls and that evening the realtor, Harry E. Voyta, Mrs. Lou I. Voyta, James Connors, W. H. Clonts, and R. G. Averitt met in the room of W. H. Clonts in the Falls Hotel.

The sale and purchase of the lands was then and there discussed, and the realtor wrote up the sale agreement, which was introduced in evidence as plaintiffs' Exhibit A. In preparing the agreement there were written into it the words, "Subject to land being leased for oil and gas by seller.", and further in the agreement the words, "Seller is to retain 4.6875% of landowners mineral rights on above-described land."

It was represented and understood at the time of the aforementioned meeting, that Hill County had reserved 6¼ per cent of the landowners' royalty and that the landowners' royalty vested in the plaintiffs was 6¼ per cent.

It was also represented and understood that the plaintiffs had leased their lands for oil and gas exploration before the sale agreement was written, and that Voyta and his wife intended to lease another part of the land before the actual deeds were executed. Voytas did lease their land on the next business day, December 3, 1951, after the sale agreement was entered into.

W. H. Clonts then returned to his home in Texas. The sale agreement required that the plaintiffs furnish Clonts with abstracts of title, showing merchantable title vested in sellers. Abstracts were furnished sometime in January 1952. Clonts had an attorney in Texas examine the abstracts and he returned to Montana about February 15, 1952. He met with the Voytas and Connors in the presence of the realtor and called to their attention the fact that the United States had reserved all minerals upon the west half of Section 30, Township 37 north, Range 14 E.M.M. By reason of that fact, Voyta agreed to reserve only 3.125 per cent of the landowners' royalty of oil and gas from the east half of Section 30, Township 37 north, Range 14 E.M.M. instead of the 4.6875 per cent reserved in the sale agreement.

Deeds were then prepared by the realtor. The deed covering the west half of Section 30, Township 37 north, Range 14 E.M.M. to Averitt contained no reservation of royalty by Voyta and wife, that being the tract wherein the United States had re-

served the minerals. The deed conveying the east half of Section 30, Township 37 north, Range 14 E.M.M., reserved a royalty interest of 3.125 per cent of all oil, gas and minerals on above-described land which are recovered and saved. The deeds conveying the other lands contained reservations by Harry E. Voyta and wife and James Connors of a royalty interest of 4.6875 per cent of all oil, gas, and minerals which are recovered and saved.

In March 1953 Voyta received a letter from the lessee of his land demanding that he return the delay rentals for the period subsequent to February 1952 because he no longer owned any mineral or leasing rights on the lands in question. Upon receipt of this letter the plaintiffs sought the advice of an attorney and initiated three suits against the defendants for reformation of the deeds upon the grounds of mutual mistake.

The three complaints were all based upon the same theory, being in effect that plaintiffs were to retain all mineral and leasing rights to the land in question by the terms of the sale agreement entered into on December 1, 1951; that the effect of the words ''Seller is to retain 4.6875 % of landowners mineral rights on above-described land'' meant that the landowners' royalty of 6¼ per cent owned by the plaintiffs was to be divided in the following portions: 4.6875 per cent royalty to plaintiffs and 1.5625 per cent royalty to the defendants. In the case of Harry E. Voyta and Lou I. Voyta against R. G. Averitt and Ruth C. Averitt the division of royalties as to the east one-half of Section 30, Township 37 north, Range 14 E.M.M. was to be on the basis of 3.125 per cent royalties in plaintiffs and 3.125 per cent royalties in defendants.

The complaints then allege that through the mistake of the scrivener, the realtor, the deeds were so drawn that all minerals including oil and gas in place were conveyed to the defendants; that because of the mistake of the scrivener no provision in the deeds was made reserving all minerals and leasing rights in the plaintiffs. Plaintiffs allege that they did not know of the error at the time the deeds were signed and did not learn of the mis-

take until March 11, 1953, when they received the afore-mentioned letter from the lessee. Prayer is then made that the court reform and revise the deeds in accordance with the alleged intention of the parties.

Defendants in their several answers admit that plaintiffs are entitled to the division of royalties as set out in their complaints, but deny that there was any mutual mistake and contend that plaintiffs never intended to reserve the mineral or leasing rights to the lands in question. The cases were consolidated for trial upon agreement of counsel for the respective parties.

At the trial of the actions the evidence is conflicting on the question of what the parties intended to convey. The plaintiffs resolutely maintain that they intended to convey only a 1.5625 per cent of the royalties to the defendants, (except of course in the tract of land to which they conveyed 3.125 per cent) retaining in themselves all other rights in the minerals. The defendants were equally adamant in denying that plaintiffs ever intended or represented that they intended to retain the mineral rights, admitting however that they did retain the afore-mentioned portions of the landowners' royalties.

At the conclusion of the trial the court found for defendants generally, and in particular that defendants owned all the mineral and leasing rights to the lands in question, but that the royalty rights were divided in the proportions set out in the complaints and answers of the parties. The plaintiffs appeal from the decrees in favor of defendants, and set out twenty-six specifications of error. The specifications of error can be ultimately resolved into only one issue however, namely, whether or not plaintiffs retained only the specified royalty rights referred to in the findings of fact and conclusions of law, or whether in addition thereto they retained all leasing and mineral rights in, under, and unto the lands in question.

Certain well-settled rules of law, relating to the field of oil and gas should be noted before this court makes its decision in this case.

*First,* Montana is an ownership in place state with regard to oil, gas and other minerals. Gas Products Co. v. Rankin, 63 Mont. 372, 393, 207 Pac. 993, 24 A.L.R. 294; Homestake Exploration Corp. v. Schoregge, 81 Mont. 604, 264 Pac. 388.

*Second,* Montana recognizes the rule that the title to the mineral interest in land, including oil and gas interests, may be segregated in whole or in part from the rest of the fee-simple title. Rist v. Toole County, 117 Mont. 426, 159 Pac. (2d) 340, 342, 162 A.L.R. 406; Krutzfeld v. Stevenson, 86 Mont. 463, 284 Pac. 553; Broderick v. Stevenson Consolidated Oil Co., 88 Mont. 34, 290 Pac. 244.

*Third,* an oil and gas lease does not operate as a conveyance of the title to oil and gas in place. Broderick v. Stevenson, supra; Hochsprung v. Stevenson, 82 Mont. 222, 266 Pac. 406; Krutzfeld v. Stevenson, supra.

" 'The lessee acquires no corporeal interest in the land itself, but rather a privilege *a prendre.* Until the actual discovery of oil, the interest of the lessee in the land is inchoate. Oil remaining in the ground before recovery is a part 'of the land, and belongs to the owner of the land; but, when recovered, it becomes personal property. Such personalty is thereupon subject to division in accordance with the terms of the contract of lease'." Broderick v. Stevenson Consolidated Oil Co., supra, 88 Mont. at page 38, 290 Pac. at page 245, quoting from Homestake Exploration Corp. v. Schoregge, supra, 81 Mont. at page 615, 264 Pac. at page 391.

There is no severance of the mineral fee by the execution of an oil and gas lease; the minerals remain intact with the land.

*Fourth,* a conveyance of land without reservations would include all mineral and mineral rights. Schlittler v. Smith, 128 Tex. 628, 101 S.W. (2d) 543, 544; 1A Summer's, Oil and Gas, section 133, page 222, 228; 58 C.J.S. Mines and Minerals, section 133, page 212; 58 C.J.S. Mines and Minerals, section 151, page 305.

As was said by Professor Summers, supra, Vol. 1A at pages 222, 228:

"But where the landowner grants the land without expressing an intention to retain his legal interest in the oil and gas thereunder, that legal interest will pass with the land as an accessory to it." See also Todd v. Hunt, Tex. Civ. App., 127 S.W. (2d) 340; Rio Bravo Oil Co. v. Staley Oil Co., 138 Tex. 198, 158 S.W. (2d) 293; Whelan v. Johnston, 192 Miss. 673, 6 So. (2d) 300; Osborn v. Arkansas Territorial Oil & Gas. Co., 103 Ark. 175, 146 S.W. 122; Kincaid v. McGowan, 88 Ky. 91, 4 S.W. 802, 13 L.R.A. 289.

*Fifth,* a conveyance or reservation of a royalty interest does ▆ not effect a severance of the mineral fee or the mineral estate (see Rist v. Toole County, supra).

*Sixth,* "Royalty," being merely a share in production, does ▆ not carry any right to give or join in leases unless the same is provided for, or the interest created is construed as the equivalent of mineral ownership. See Calcote v. Texas Pacific Coal & Oil Co., 5 Cir., 157 F. (2d) 216, 167 A.L.R. 413, certiorari denied 329 U.S. 782, 67 S. Ct. 205, 91 L. Ed. 671, rehearing denied 329 U.S. 830, 67 S. Ct. 356, 91 L. Ed. 704; Skelly Oil Co. v. Cities Service Oil Co., 160 Kan. 226, 160 Pac. (2d) 246; Gulf Refining Co. v. Goode, 212 La. 502, 32 So. (2d) 904; St. Martin Land Co. v. Pinckney, 212 La. 605, 33 So. (2d) 169; Rist v. Toole County, supra; Pure Oil Co. v. Kindall, 116 Ohio St. 188, 156 N.E. 119; Carroll v. Bowen, 180 Okl. 215, 68 Pac. (2d) 773; Schlittler v. Smith, supra; Denver Joint Stock Land Bank of Denver v. Dixon, 57 Wyo. 523, 122 Pac. (2d) 842, 140 A.L.R. 1270.

In St. Martin Land Co. v. Pinckney, supra, in the concurring ▆ opinion of Mr. Justice Hamiter it was said:

"The owner of the mineral royalty, whose role is entirely passive, has no privilege of ingress or egress to the land, and hence, cannot produce the minerals. Furthermore, his consent for the execution of a lease is not required, nor is he entitled to participate in the bonus or the delay rentals that may be

paid under its terms. The right that he has is but an appendage of the right of the mineral owner, and is merely one to share in the production of oil, gas and other minerals if and when they are produced.'' 33 So. (2d) at page 174.

Governed by these rules and applying them to the facts adduced at the trial of this action we find: (1) That the oil and gas leases on the lands of Voyta, Voyta's wife and Connors did not effect a severance of the mineral fee or estate. (2) That to effectively sever the minerals from the surface the landowner must have expressly made the severance by express words.

It is contended that this was done by utilizing the words ''Subject to land being leased for oil and gas by seller,'' and ''8. Special provisions: Seller is to retain 4.6875% of land owners mineral rights on above described land.''

Although, in ''8'', the term ''land owners mineral rights'' was used in expressing the reservation, both parties interpreted this provision as merely referring to the division of the royalty vested in the landowner under the existing oil and gas leases with the 6¼% royalty reservation in Hill County. This was admitted at the trial and in the pleadings by both parties.

Now on appeal, plaintiff would persuade this court that the term ''mineral rights'' contained in section ''8'' had particular significance as denoting the fact a mineral interest was reserved. Not so! Giving the reservation the construction agitated for by the plaintiff would accomplish the following result:

4.6875% of the minerals would only give a proportionate share in the royalty, viz.: 4.6875% of 12½% or .5859% of the gross production, admittedly much less than the amount contemplated in the agreement.

It was made very clear at the trial and in the pleadings, that Section ''8'' was inserted in the agreement to indicate the amount of royalty reserved in the plaintiff. Any other interpretation is ridiculous and inconsistent with the intention of the parties.

We come now to a consideration of the term ''Subject to

land being leased for oil and gas by seller.'' Plaintiffs maintain this provision meant he was to retain all leasing rights in the property together with all mineral rights. Defendants averred that the provision was placed in the agreement merely to show that the land had been previously leased for oil and gas by the plaintiffs; the land was then under lease.

The lands of Voyta were subsequently leased on December 3rd. He admitted that the agreement to enter into such a lease had been made prior to the December 1st meeting with defendants. The ''Subject to'' clause, the defendants claim, gave Voyta the right to close the lease before actual deeds were conveyed, but did not give him the ''mineral fee.''

The general rule is that the right to lease property is commensurate with a mineral ownership thereof, Annotation, 4 A.L.R. (2d) 497, 498, 499; Sullivan, Assignments by the Landowner and the Lessee, 17 Mont. L. Rev. 64, 65, *but the right to prescribe the terms for leasing land may be granted for a term only.* See Brooks v. Mull, 147 Kan. 740, 78 Pac. (2d) 879. However, in the instant case there is no clear-cut reservation of the leasing privilege for term or perpetuity. The injection of the troublesome phrase is ambiguous at most, and the evidence was conflicting as to the intention of the parties in inserting it into the agreement.

*As heretofore noted this was an action to reform a deed.*

Since plaintiffs' theory of recovery is based upon mutual mistake for which the remedy of reformation is available, certain rules with regard to this form of relief should be set out. It is said in Conner v. Helvik, 105 Mont. 437, 73 Pac. (2d) 541, that the right of reformation of a deed depends upon particular facts and circumstances and on equitable showing.

In Sullivan v. Marsh, 124 Mont. 415, 422, 423, 225 Pac. (2d) 868, 872, this court set out the elements which are necessary in every case in order to seek reformatory relief in the following succint statement:

''Reformation for mutual mistake presupposes a prior understanding and agreement. It must be clear that the parties have

come to a complete and mutual understanding. This is necessary; otherwise there would be no standard in accordance with which the writing could be reformed. Restatement of the Law of Contracts, section 504, at page 969.

"A sequence statement of reformation is this: There is a prior understanding of the parties; the parties execute a written contract; somewhere and sometime between the understanding reached and the actual creation of the written instrument, a mistake occurs. It occurs in reducing to writing the agreement which the parties have intended. Obviously the alleged mistake must relate to something then in the contemplation of the parties. The fault sought to be corrected is that the executed written instrument does not reflect the actual and true understanding of the parties. This is a cardinal principle in the field of reformation for mutual mistake. Then, and only then, can the powers of equity be invoked to correct the mistake."

However, in order to reform a contract on the ground of mutual mistake, the evidence of the mistake must be clear, convincing and satisfactory. August v. Burns, 79 Mont. 198, 255 Pac. 737; Bitter Root Creamery Co. v. Muntzer, 90 Mont. 77, 300 Pac. 251; Evankovich v. Howard Pierce, Inc., 91 Mont. 344, 8 Pac. (2d) 653. It is also well-settled that if any uncertainty existed in the sale agreement and the deeds, then it must be construed most strongly against the person causing the uncertainty — in this case the realtor, scrivener, who in turn was plaintiffs' agent. R.C.M. 1947, section 13-720; Hart v. Barron, 122 Mont. 350, 204 Pac. (2d) 797.

R.C.M. 1947, section 17-902, provides:

"For the purpose of revising a contract, it must be presumed that all the parties thereto intended to make an equitable and conscientious agreement."

R.C.M. 1947, section 17-903, provides:

"In revising a written instrument, the court may inquire what the instrument was intended to mean, and what were intended to be its legal consequences, and is not confined to the

inquiry what the language of the instrument was intended to be.''

In Sullivan v. Marsh, supra, 124 Mont. at page 425, 225 Pac. (2d) at page 874, the court said: *''The presumption is that the writing contains the final agreement of the parties and expresses their real purpose and intent. To meet and overcome that presumption planitiff was required to present clear, convincing and satisfactory proof.* [Citing case.]

''The general rule is that to obtain reformation the mistake must be mutual. [Citing cases.]'' Emphasis supplied.

In the same case the court clearly pointed out that in a suit for reformation of a contract the office of equity is not to make a new contract for the parties, but to enforce an already existing one.

As was said in Humble v. St. John, 72 Mont. 519, 525, 234 Pac. 475, 477:

''It cannot be said that the evidence in this case is either clear, convincing, or satisfactory, as to the alleged mistake. Much less can it be said that the evidence clearly preponderates against the determination of the trial court.''

In such a situation the rule is well-established that the credibility of the witnesses and the weight to be given their testimony was for determination by the trial court. Its findings here are supported by substantial evidence and should not be disturbed. Notti v. Clark, Mont., 322 Pac. (2d) 112, and cases cited therein.

For the foregoing reasons the judgment is affirmed.

MR. JUSTICES CASTLES and ANGSTMAN, and THE HONORABLE W. M. BLACK, District Judge, sitting in place of MR. JUSTICE BOTTOMLY, concur.