ADOLPH F. FAVERO AND HAZEL B. FAVERO, PLAINTIFFS
AND RESPONDENTS, *v.* GAYLE WYNACHT, DEFENDANT AND
APPELLANT.

No. 10236.
Submitted February 14, 1962. Decided May 22, 1962.
Rehearing denied June 11, 1962.
371 P.2d 858.

Sandall, Moses, Cavan & Battin, Charles F. Moses (argued orally), Billings, for appellant.

Franklin S. Longan (argued orally), Longan & Calton, Billings, for respondents.

MR. CHIEF JUSTICE HARRISON delivered the Opinion of the Court.

This is an appeal by the defendant from a judgment entered in the District Court of Yellowstone County, Montana, in an

action to reform and enforce a contract of sale on the ground of mutual mistake.

The plaintiffs, Adolph and Hazel Favero, husband and wife, as the first parties, and the defendant, Gayle Wynacht, and one Neil E. Anderson, as the second parties, on July 21, 1947, entered into a contract of sale whereby the plaintiffs sold the corporate assets of the Abstract Guaranty Company to the purchasers, being the second parties, for the sum of $58,075.19, reserving a one-third interest in a partnership to be formed by the plaintiffs and the defendant and Anderson, each to have a one-third interest therein. The partnership was to be formed after the purchase price and interest thereon had been repaid to the sellers.

Certain preliminary facts should be set forth: Both Wynacht and Anderson were long-time employees of the Abstract Guaranty Company, a corporation, and were licensed abstracters. Mrs. Alma Welliver was the majority owner and president of the corporation and she made an offer to Wynacht to purchase the firm. Neither Wynacht nor Anderson had sufficient funds to make the purchase and Hazel B. Favero was a long-time friend of Gayle Wynacht so Wynacht contacted Mrs. Favero in June of 1947 concerning possible purchase of the corporation. Two or three weeks passed after the first discussion and Wynacht again contacted Mrs. Favero, who told her she was not interested. This was very disturbing to Wynacht and after much further discussion during which some tears were shed, Mrs. Favero told Wynacht that she would have her accountant look at the corporate books and advise her if she should make the purchase, and that it would take every cent the Faveros could get hold of and they might have to borrow some. It was decided at this conference that if Mrs. Favero decided to buy the business she would sell a two-thirds interest to Wynacht and Anderson and retain a one-third interest for herself.

It must be remembered here that the Faveros knew nothing of the abstracting business, and, according to Mrs. Favero, through-

out the whole series of negotiations Wynacht handled all the arrangements for the purchase of the corporate assets, the Faveros never contacted anyone in the corporation since Wynacht and Anderson were both employees. Likewise all the parties had a mutual attorney who handled all of the negotiations for them and drew all of the instruments used in the transaction.

On July 16, 1947, a letter was prepared by the attorney, signed by the Faveros, and directed to Wynacht and Anderson outlining in a general way the arrangement between the parties and stating that it was written for the purpose of giving them something for their files for the time being, and therein this statement was made:

"This letter is written to confirm, in a general way, our understanding with each other, should we get the property of the Abstract Guaranty Company that we are trying to buy. In that event we will effect, then, an arrangement with you under which you will be permitted to use the acquired property to carry on an abstract of title business, with the obligation to us to repay our principal investment, with interest thereon, such repayment to be made at the rate of not less than $600 per month. The understanding further is that, when we have been paid our principal and interest, we shall have then and thereafter retain a one-third interest in your abstract of title business and assets, through a proper partnership agreement, and that at such time we will convey to you the property and assets you have been using theretofore. Proper agreements will be drawn to effectuate this plan at the proper time."

Wynacht and Anderson signified their satisfaction by placing their signatures upon this letter following this statement:

"The foregoing is satisfactory to us and we agree to the handling of matters as outlined therein."

On the same day another letter prepared by the attorney was addressed to the Abstract Guaranty Company which contained this statement:

"* * * we are writing this letter as an offer to buy all of

the assets of your company that are presently used in the conduct of your abstract of title business, * * *.'' And among the conditions of the offer was this:

''1. That you shall immediately inventory all of the property so used in the transaction of your abstract of title business and have it checked and certified as to its correctness by Neil Anderson and Gayle Wynacht, presently in your employ, as containing all property so used, and then supply us with such checked and certified copy to be annexed hereto as part of this proposal;

''2. That your Company shall take such corporate proceedings as are required under the laws of the. State of Montana to consummate a sale of the property as above and to vest us with valid title to the same, and shall also, by such corporate proceedings, authorize us, upon the consummation of the sale of the above property, to have the exclusive right to use hereafter the name 'Abstract Guaranty Company' in the conduct of an abstract of title business, either by ourselves or otherwise;
* * *

''6. That upon the acceptance of this proposal by your company, by its endorsement hereon, we shall immediately pay to your Company the sum of $1,000 as part payment of the aforesaid consideration, and that the balance of the said consideration shall be payable in current lawful money of the United States of America when the foregoing conditions of the proposal have been met by your Company and instruments of conveyance and assignment are delivered to us that are legally effective to transfer a merchantable title to the property and rights involved; that, meanwhile, the undersigned shall be given possession and control of the property we are proposing to purchase, with the right to engage in and carry on the abstract of title business heretofore conducted by your Company and, in that connection, to use the quarters presently occupied by your Company in the Securities Building, Billings, Montana, and under the existing lease of such quarters; * * *.''

There was another letter written on July 17, 1947, making a modification, but it is not material here.

On July 18, the Abstract Guaranty Company replied as follows:

"Billings, Montana
"July 18, 1947

"Adolph and Hazel Favero
  "c/o Wood, Cooke & Moulton
  "Securities Building
  "Billings, Montana

  "Dear Mr. and Mrs. Favero:

"The Abstract Guaranty Company hereby accepts your offer dated July 16, 1947, as modified by Mr. Sterling M. Wood's letter of July 17, 1947, to purchase all of its assets that are presently used in the conduct of its abstract business. All bills and accounts receivable are to be included in the sale, but all cash on hand and all securities owned by the company are to be retained by it.

"We expect that we will be able to close this deal very promptly.

"Yours very truly,
"ABSTRACT GUARANTY
  COMPANY
"By /s/ ALMA M. WELLIVER
"Its President

"ATTEST
"/s/ Stuart C. Kelly
"Its Secretary."

A special meeting of the stockholders of the Abstract Guaranty Company was held on July 18, and it was attended by Neil E. Anderson, who was one of the stockholders. The letter containing the offer from the Faveros was presented at this meeting and is set out in full in the minutes. A resolution was offered to accept the offer for the purchase of all of the

assets of the company, excepting cash on hand and bonds and other securities. This resolution was passed on the unanimous vote of the stockholders. Further discussion was had at this meeting as to the future activities of the company in view of the fact that it would no longer be engaged in the abstract business, and a resolution was offered to liquidate the business and distribute a liquidating dividend to the stockholders and cancel the capital stock of the company, in that thereupon the company should be dissolved. This resolution again was passed by the unanimous vote of the stockholders.

The inventory was prepared and accepted and approved by Wynacht and Anderson. Bill of sale from the Abstract Guaranty Company to the Faveros was prepared and executed on July 19, 1947. The consideration of $64,657.14 was paid to the corporation on July 21, 1947. The difference in amount between the purchase price and contract of sale price represented the accounts receivable.

On this latter date an agreement, which was prepared by the parties' mutual attorney, was executed, which recited that the Faveros had purchased the property listed in the inventory which had been theretofore used by the Abstract Guaranty Company in the operation of an abstract of title business, and that the purchasers Wynacht and Anderson were licensed abstracters and desired to purchase the property listed in the inventory so that it might be used by them in the conduct of an abstract of title business and the owners were willing to sell it for such use. The purchasers agreed to devote their entire time and attention to the business and enter into a partnership for that purpose, with the right to use the property for that purpose but the title to remain in the owners until the agreement was fully performed. The purchase price was $58,-075.19, to be payable not less than $600 per month, commencing September 1, 1947, and contained this further provision:

"2. * * * that, furthermore, if the profits of the abstract

of title business of the Purchasers in any year shall be sufficient to give the said Purchasers a good living and leave a surplus of profits, that thereupon one-third of such surplus shall then be paid upon the said purchase price of the property in addition to the required monthly payments; * * *''

The agreement also contained this provision:

''7. That if, as and when the Purchasers herein shall fully pay to the Owners the principal amount as aforesaid with interest thereon, (and the right is hereby reserved and granted to the Purchasers to pay the entire amount, both principal and interest, at any time) that thereupon the Owners shall be obligated to convey to the said Purchasers the property listed in Schedule A, together with the said appurtenances, reserving to themselves, however, a one-third interest in the said property and appurtenances, and in the profits of the abstract of title business thereafter conducted through the use of such property and appurtenances; * * *''

It is apparent from these instruments that the Faveros were purchasing the abstracting business and selling it to appellant and Anderson and they were to form a partnership with the plaintiffs after the purchase price with interest has been repaid, whereby the plaintiffs would have a one-third interest, the defendant a one-third interest and Anderson a one-third interest. The purchase price with interest was repaid in full to the Faveros by December 29, 1954.

On December 31, 1950, Wynacht bought out Neil E. Anderson for the sum of $19,562.20, which she paid at the rate of $500 per month from funds of the Abstract Guaranty Company.

The plaintiffs filed their complaint in this action on April 13, 1955, and thereafter an amended and supplemental complaint was filed wherein plaintiffs prayed:

''(1) That the contract Exhibit 'A' be reformed to include and specify in addition to the personal property therein designated, the entire assets, abstract business, title insurance business, good will, and lease-hold interest of the Abstract Guar-

anty Company, a corporation, as the subject matter of the sale from the plaintiffs to the defendant.

"(2) That the contract Exhibit 'A' be reformed to include the agreement reached by the parties on July 16, 1947, to the effect that the plaintiffs would be entitled to the rights and benefits of partners to the extent of a one-third interest in all the assets and business of the Abstract Guaranty Company from and after the date that the principal sum of $58,512.19 with interest thereon had been fully paid by the defendant.

"(3) That the contract Exhibit 'A' be reformed to include the agreement reached by the parties on July 16, 1947, to the effect that a partnership agreement be made by the parties from and after the date that the principal sum of $58,512.19 with interest thereon had been fully paid by the defendant.

"(4) That the defendant be adjudged to account to the plaintiffs for their share of the profits of the Abstract Guaranty Company from and after May 31, 1954.

"(5) That the court order an accounting to be made by a qualified accountant of all of the books, records, property, income and revenues of the Abstract Guaranty Company from and after July 21, 1947.

"(6) That the defendant be enjoined from distributing to herself any profits until she first distributes to the plaintiffs their share of the profits for the operation of the business from and after May 31, 1954.

"(7) That it be adjudged that the defendant has breached the agreement of the parties by her wrongful distribution of all of the profits to herself since May 31, 1954.

"(8) That it be declared and adjudged that the defendant has breached the contract by holding herself out to the public as the sole proprietor of the Abstract Guaranty Company and the sole owner thereof.

"(9) That it be declared and adjudged that the defendant has breached said agreement by withdrawing therefrom in-

equitable amounts of money for her own personal use and benefit, and that her withdrawals be limited to $750 per month, or an equitable sum to be found by the court.

"(10)    That the plaintiffs have and recover from the defendant the sum of $45,000 or such sum as may be found due the plaintiffs for breach of said agreement.

"(11)    That the plaintiffs may have interest on all amounts found to be due from and after their payable date.

"(12)    For such other and further relief as may to the court seem meet and equitable in the premises and for the plaintiffs' costs of suit herein laid out and expended."

The defendant's answer, while admitting the execution of the agreement, for the most part consists of a general denial, and specifically denied that the title insurance business was included in the sale of the business conducted by the Abstract Guaranty Company and also disputed the interpretation of the contract between the parties as contended by the plaintiffs. The defenses of the statute of limitations and usury were also raised.

Following a trial before the court sitting without a jury, the court made its findings of fact which generally found the contentions of the plaintiffs to be true, and that a judicial accounting was necessary to adjust the respective rights of the parties. Based upon such findings the court concluded:

"I.    That the said contract dated July 21, 1947, is in full force and effect and has never been terminated; that the contract dated July 21, 1947, was paid up on May 31, 1954.

"II.    That a partnership has existed between the plaintiffs and the defendant since May 31, 1954; that the plaintiffs have one-third interest, and the defendant two-thirds interest in the partnership; that the defendant owes to the plaintiffs one-third of the partnership profits from and after May 31, 1954; that plaintiffs' offer to do equity by assuming plaintiffs' share of all partnership liabilities from and after May 31, 1954, is equitable and sufficient.

"III.    That the contract dated July 21, 1947, be reformed to

include and specify in addition to the personal property therein designated the entire assets, the abstract business, the title insurance business, the good will, the leasehold interest of the Abstract Guaranty Company, a corporation, as the subject matter of the sale from the plaintiffs to the defendant.

"IV. That the contract dated July 21, 1947, be reformed to include the agreement reached by the parties on July 16, 1947, to the effect that the plaintiffs are entitled to the rights and benefits of partners to the extent of a one-third interest in all the assets and business of the Abstract Guaranty Company from and after the date that the principal sum of Fifty-Eight Thousand Five Hundred Twelve Dollars and Nineteen Cents ($58,512.19) with interest thereon had been fully paid by the defendant; that the contract of July 21, 1947, be reformed to include the agreement reached by the parties on July 16, 1947, to the effect that a partnership agreement be made by the parties from and after the date that the principal sum of Fifty-Eight Thousand Five Hundred Twelve Dollars and Nineteen Cents ($58,512.19) with interest thereon had been fully paid by the defendant.

"V. Plaintiffs duly performed all covenants and conditions in said contract dated July 21, 1947, to be performed, and all covenants and conditions to be performed as reformed.

"VI. That plaintiffs' offer to do equity by lodging with the Clerk of this Court a proper bill of sale referred to in Paragraph VII of the Second Cause of Action is equitable and sufficient.

"VII. That under the direction of this Court an accounting be made by a qualified accountant of all of the books, records, property, income and revenues of the Abstract Guaranty Company from and after July 21, 1947.

"VIII. That a judicial accounting is necessary to determine what the defendant owes to the plaintiffs of the partnership profit from and after May 31, 1954, if any; that such an accounting is necessary to determine amounts and the fairness

of withdrawals by defendant for her own personal use and benefit; that such an accounting is necessary to determine the respective rights of each party under the agreements so reformed here.

"IX. That the Court reserves jurisdiction to settle and determine any controversies which may arise between the parties in the performance by them of the terms of the decree to be entered."

Judgment was thereafter entered pursuant to such findings and conclusions and the defendant appealed.

Defendant has set forth numerous specifications of error but they in general have to do with certain questions which are raised in the argument.

We will list these questions and proceed to a discussion of each.

(1) Was title insurance a part of the abstract of title business?

(2) Was there a mutual mistake?

(3) If there was a mutual mistake was it barred by the statute of limitations?

(4) May the court order an accounting?

(5) May the court reform the agreement to include a partnership between the parties?

(6) Was the arrangement a sale or a usurious loan?

Turning now to a discussion of these various questions:

(1) Was title insurance a part of the abstract of title business?

It is the position of the defendant that an abstract of title business does not include title insurance and that since the agency contract with the title insurance company was issued in the name of defendant and Neil E. Anderson it cannot be considered as a part of the property purchased by the Faveros and resold under the contract of sale.

It is undisputed that the Abstract Guaranty Company was a going business and was to be purchased by the Faveros as a

going business, and as such resold under the contract. The attorney in preparing the contract referred to such going business as the "conduct of an abstract of title business" and that the property listed in Schedule A attached to the contract should be used for that purpose. The property listed in Schedule A was copied from the inventory of the Abstract Guaranty Company dated July 1, 1947, which had been accepted and approved by the defendant and Neil Anderson. Of the parties involved here only the defendant knew what comprised conducting an "abstract of title business", and the Faveros knew nothing whatever about the business nor did they seek to learn, at all times relying on the good faith and representations of the defendant. When the defendant and Anderson accepted and approved the inventory they were aware that it did not mention the title insurance business, well-knowing at the time the title insurance constituted a part of the abstract of title business.

While defendant contends that the sales contract was merely a financing arrangement to afford security to Faveros until the principal and interest were repaid, and makes much of the fact that the abstracting plant was bought one day and sold the same day at the same price, reserving a one-third interest in the assets and one-third interest in the profits of the abstract of title business after the full principal and interest were repaid, in our view this is not a correct interpretation of the arrangement. The purchase price and interest were repaid not from the funds belonging to Wynacht and Anderson but from the funds accruing in the business and therefore the Faveros contributed one-third of their interest in such funds to repaying themselves the purchase price which they advanced. This should be borne in mind at all times in our consideration of this matter since it seems to have been entirely overlooked by the defendant.

Under the contract, except for wages, designated therein as "a good living" to be paid to the defendant and Anderson, the two persons who would devote their entire time to the business,

profits accruing from the operation were to be applied on the contract until the principal and interest had been paid. It was the same type of business arrangement that is entered into every day in the business world between those who have the money to back a business venture and those who have the acumen and knowledge to operate a business but are without funds to make the purchase.

This is not a situation where the Faveros received one-third of the profits of the business and the defendant and Anderson repaid the principal and interest from their two-thirds share.

From the record here it is apparent that title insurance policies are written in the office of the company, or written by the company as agent, the receipts therefrom have been mingled with other receipts of every nature, all expenses incident to writing title insurance are paid by the company, in other words it forms, and is, an integral part of the operations of the Abstract Guaranty Company.

It is well known that to write title insurance it is necessary to have access to plats and record indexes and they were available here, being owned by the company. If it were true that the title insurance business was no part of the abstract of title business, what payment has been made by the defendant or her former partner Anderson to the company for the use of its property, or for the quarters in which such title insurance business has been conducted?

There have been none, and rightly so, since the abstract of title business covered all the incidents customarily found therein, which in this instance, since it was a going business which was purchased, included the physical properties such as desks, typewriters, plats, indexes, and so forth, and the wares which could be produced from the use thereof, abstracts, title insurance policies, and the like, and the intangible assets such as the good will and the name under which the company operated. Under the facts present in this case it is our opinion that title insurance was a part of the abstract of title business.

(2) Was there mutual mistake?

As before pointed out, one attorney was employed and he represented all parties to the transaction and drafted the various instruments. He testified that it was the intention of the parties to transfer the whole business of the Abstract Guaranty Company and whatever it possessed, and in drafting the instruments he was attempting to accomplish that purpose. There was no quibbling or quarreling between the participants. They were all on extremely friendly terms. Counsel freely admitted he was extremely busy at the time the instruments were prepared, and the parties were more or less constantly after him to get things done, and he did not define abstract of title business in the manner it had been explained to him. As he testified:

"Q. What I am getting at, is there two businesses referred to in Plaintiff's Exhibit 2 [a partnership agreement between Gayle Wynacht and Neil E. Anderson], and one business referred to in Plaintiff's Exhibit No. 1 [the sale contract]? A. I am going to answer that question in this way, and correct me or strike it out as you please: It was constantly brought to my attention in the conversations and in the negotiations and in contracts leading up to the drafting of all of these documents that an abstract of title business, the maintaining of an abstract of title business comprehended not only the preparation of abstracts, using the indices in that connection, but also it would include and did include the obtaining of title insurance; that the carrying on of an abstract business necessarily comprehended those items. Does that answer your question?"

On cross-examination he testified:

"Q. There is nothing in the letter dated July 16th, 1947, which would indicate in any way how the title insurance contract would be transferred, was there? A. As I have told you before and say again, I can only answer your question in this way: That the effect of this letter was to show that the Abstract Guaranty Company was to be put out of business, and that the others were to take over.

"Q. Well, was there any arrangement made by you as an attorney handling this transaction, to transfer the agency contract for title insurance, if there was one, to the proper parties? A. No arrangement was made with me.

"Q. Was anything done in that respect? A. Yes, as I have told you before, it was the understanding of all of the parties, as expressed to me, I didn't have it because I didn't know, that in the arrangement to carry on an abstract of title business, that comprehended everything, and therefore that there would be transferred under those conditions, with the concern put out of business, whatever the company had been using theretofore for its business."

Further he testified:

"Q. That agreement, at least at that time, represented what you felt to be the fair understanding of the parties, and that they were bound thereby? A. Yes, subject to the matter of mistake as to some items that I referred to earlier.

"Q. Well now, that agreement does not in any place provide for a partnership between the parties? A. No, but the earlier document did.

"Q. Yes, I am referring only to Plaintiff's Exhibit 1 [the sales contract]. A. Well, I have already said heretofore, and I may again now, that that was omitted through mistake on my part."

It is hard to conceive of a clearer acknowledgment of mutual mistake by the attorney for all concerned.

In Voyta v. Clonts, 134 Mont. 156, 328 P.2d 655, following a line of previous decisions therein cited, we held that in order to reform a contract on the ground of mutual mistake the evidence of the mistake must be clear, convincing and satisfactory.

In our opinion the evidence here is of that character, and we fail to perceive any credible evidence to refute it.

█ (3) If it was a mutual mistake was it barred by the statute of limitations?

Defendant contends that the cause of action for reformation

is barred by section 93-2607, R.C.M.1947, subd. 4, which reads: "*Two-year limitation.* Within two years: * * *

"4. An action for relief on the ground of fraud or mistake, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake."

It is argued that if a mistake was made it occurred in July 1947, and this action was not commenced until approximately seven years later. The reasoning of defendant is that she was not guilty of any concealment or any other practice which would have prevented discovery of the alleged mistake and that plaintiffs are presumed to know what they might have discovered by ordinary diligence, and in the absence of any showing of justification or excuse on their part the action must be held to be barred.

Mrs. Favero testified:

"A. I thought I had purchased everything that the Abstract Guaranty Company, a corporation, had, and when I was up at Mr. Wood's office on July 21st, I asked Neil and Gayle both if they had inventoried everything, and Gayle said, 'Yes, I went over it with Stuart Kelly and on the bill of sale you received my signed statement, everything.'

"Q. So that your understanding was different than what the bill of sale from the corporation was, is that right? A. No, I thought it meant all personal property of every kind and everything that they had.

"Q. Well, when did you think that it didn't give you that? A. In 1954.

"Q. Now when, in 1954, Mrs. Favero? A. In December."

It was in December of 1954 that the Faveros became aware that defendant was asserting her right to all the profits of the business. The action was commenced in April of 1955, which indicates that the action was promptly brought and well within the two-year limitation provided by statute, after the discovery of the facts constituting the mistake.

(4)    May the court order an accounting?

██    It is defendant's contention that no demand for an accounting has been made nor any refusal to furnish one. It is true that the plaintiffs' accountant kept the books and submitted statements to them. Defendant cites Wetzstein v. Boston & M. Co., 28 Mont. 451, 72 P. 865, as authority that a demand and refusal are necessary prerequisites to be pleaded and proved in order to maintain an action for an accounting.

Plaintiffs requested an accounting for the purpose of checking the reliability of the monthly balance sheet and income statement and the court found that a judicial accounting was necessary to adjust the respective rights of the parties, and concluded that it was necessary to determine what the defendant owed to the plaintiffs, to determine amounts and fairness of withdrawals by defendant for her own personal use and benefit, and to determine the respective rights of each party under the agreements as reformed. We believe the court was correct in its finding and conclusion.

There is a difference between an action for an accounting and an action founded in equity where the accounting is sought as one of the incidents of granting complete relief such as exists here. See Thompson v. Bantz, 136 Mont. 210, 346 P.2d 982, a recent case where this same procedure was followed.

██    (5) May the court reform the agreement to include a a partnership between the parties?

Under the doctrine that the court will not perform an idle act, defendant contends that the court may not reform an agreement to include a partnership, since equity will not enforce the making of a partnership agreement.

Defendant cites the rule that "An agreement to enter into a partnership at will or for an indefinite period will not be enforced in equity, since such partnership may be immediately dissolved by either party." 81 C.J.S. Specific Performance, § 15, p. 438.

We do not disagree with such statement but it does not con-

tain the whole story. There is this further addition: "However, a decree ordering the execution of the partnership's articles will nevertheless be made if necessary to invest a partner with the legal rights for which he had entered into the partnership, although after the articles are executed, the parties cannot be compelled to act under them." 81 C.J.S. Specific Performance § 15, p. 439.

"* * * Where the partnership is for a fixed term, where there has been part performance on plaintiff's part, and where it is essential to the ends of justice that the status of the parties be fixed by the execution of the partnership articles, this may be decreed, although the parties will not be compelled to act under them after the execution." 81 C.J.S. Specific Performance § 81, p. 591. Citing Hart v. Hart, 188 App.Div. 283, 176 N.Y.S. 790; Goldberg v. Kitchstein, 36 Misc. 249, 73 N.Y.S. 358. See also Somerby v. Buntin, 118 Mass. 279.

However, the judgment here did not order that a partnership agreement should be entered into. The court ordered the contract reformed to call for the formation of a partnership. This, of course, is in line with the letter of July 16, 1947, which stated: "The understanding further is that, when we have been paid our principal and interest, we shall have then and thereafter retain a one-third interest in your abstract of title business and assets, through a proper partnership agreement * * *."

The court's judgment then recited that the parties were partners since May 31, 1954, and that all assets of the company were partnership property and directed that the company be carried as a copartnership on any leases, agency contracts, etc.

The court was merely carrying out the intent of all the parties as to the manner of handling the matters, as evidenced by the letter and acceptance. The court did not create a new vehicle, i. e., a copartnership, it held one had been in existence under terms of the parties' own agreement, and clearly this was necessary to vest title in the plaintiffs.

(6) Was the arrangement a sale or a usurious loan?

Defendant, under a counterclaim contended that the arrangement only contemplated a loan of money by the Faveros. Under the provisions of section 47-125, R.C.M.1947, limiting the rate of interest under a written agreement in an amount not exceeding ten percent, defendant sought to recover the penalty provided in section 47-126, R.C.M.1947, being a forfeiture of a sum double the amount of interest which the instrument carried which had been agreed to be paid thereon.

While defendant cites authorities for her position we do not believe they are applicable to the situation here. Clearly a reading of the agreement between the parties indicates that it was a sale contract.

Under our statute, section 93-216, R.C.M.1947, in appeals of an equitable nature, we review all questions of law and fact arising upon the evidence presented in the record.

We have many times stated in our opinions, that in equity cases we will not disturb the trial court's findings where there is substantial evidence to support them, and we cannot overturn findings unless there is a decided preponderance of the evidence against them. See Bouma v. Bynum Irr. Dist., 139 Mont. 360, 364 P.2d 47; Roth v. Palutzke, 137 Mont. 77, 350 P.2d 358; George v. Fish Creek Irr. Co., 135 Mont. 490, 342 P.2d 738; Havre Irr. Co. v. Majerus, 132 Mont. 410, 318 P.2d 1076.

Portions of the evidence have been referred to in this opinion heretofore but other portions should be considered in determining where the preponderance of the evidence lies.

The defendant was called for cross-examination as an adverse party by the plaintiffs. She testified that she did not know whether the corporation sold its entire business for the reason that she was not called in on the negotiations. She did admit that she knew it afterwards when she was ready to sign the papers, but not until then. She further testified that she and Neil Anderson were very concerned about what was going on.

Contrast this with the testimony of the mutual attorney who was asked with regard to the arrangements this question:

"Did you discuss this matter with Faveros and Mrs. Wynacht in your office, all together at any time? A. Well, off and on; you know, they would come in and go out and come in and go out, and we probably had a lot of talks on that subject."

Wynacht further testified that there was a verbal agreement by the owner of the corporation to sell to her and that the Faveros "beat her out of it," although admitting that after she had been given the opportunity to buy she contacted Mrs. Favero. Wynacht's version of the transaction was that it was her understanding that the Faveros were going to loan her the money and the first knowledge she had that it was otherwise was when the sale contract was presented to her to sign and that while she signed the contract with the Faveros she was not very satisfied or happy. She further stated that she had nothing to do with the preparation of the inventory though she signed it, which was for the purpose of certifying to its correctness. She stated first that the attorney who prepared the papers was not her attorney, that he was representing the Faveros; then she later admitted that the attorney was helping her also, so it was not necessary that she have an attorney. Finally she admitted that she paid such attorney, but stated he considered it as a gift and not as a fee.

With reference to her feelings toward Mrs. Favero prior to and in 1947, it appears that Wynacht was the best lady at Mrs. Favero's wedding, they were very good friends, and Wynacht went on the Favero's honeymoon with them for about a week.

Now testifying years later when this lawsuit was tried, Wynacht claimed she was duped and did not know until the morning of July 16th about the provisions of the contract and that it was too late then to do anything since the Faveros already had the company in their name. First stating that she did not complain to the attorney, she later stated she did object to the attorney in 1947. She claimed to have objected to the one-third interest, but she did sign the contract. The attorney testified that so far as he could recall at no time had Wynacht ever made

any objection to him concernng the terms of any instrument. Further, counsel testified:

"Q. Well, did all of the contacts that you have had with them appear to be friendly, not only between you and them, but as between themselves? A. Yes.

"Q. And did it appear to you that Mrs. Wynacht was very happy that she was able to buy into the abstract business? A. I certainly never heard her express any unhappiness in that connection or I would have remembered it."

Referring back to Wynacht's testimony again, she stated she expected to be financed to buy the Abstract Guaranty Company by the Faveros and to pay them a reasonable amount of interest and a bonus for the use of their money, but *she did not discuss this with the Faveros, these were merely her thoughts.*

Despite the repeated statements of the defendant that she was to have all the property personally, this testimony of the mutual attorney is enlightening:

"Q. Was it ever the intention of the parties that Mrs. Wynacht was to have the entire title to all of the business that was bought and sold by these agreements? A. No.

"Q. As you understood it, was it the intention of the parties that after Mrs. Wynacht and Neil Anderson had paid the purchase price of $58,000 plus, that the parties were, the three parties were each to have a one-third interest, Mrs. Wynacht, Mr. Anderson and the Faveros? A. Well, I will put it this way: That Mr. Anderson and Gayle Wynacht were to have two-thirds and the Faveros one-third.

"Q. There never was any other arrangement discussed with you by Mrs. Wynacht, was there, Mr. Wood? A. No."

Wynacht finally admitted that after she signed the sale contract she decided she was going to have the title insurance business as her own and that it would not be for the benefit of the Faveros.

The record discloses that the title insurance commissions as compared with abstract fees increased each year until in 1952

such commissions exceeded the abstract fees in amount, and that situation continued thereafter.

. Wynacht's salary from the corporation was $275 per month, with a profit sharing arrangement, at the time of the sale. Commencing in July of 1947 she withdrew $500 per month; increased it in January 1952 to $600; increased it in January of 1954 to $700, and again in June of 1956 to $850. The evidence further discloses she made very substantial withdrawals in addition to the monthly ones mentioned above.

The gist of Wynacht's position is tersely stated:

"Q. You don't feel that the contract you signed amounts to anything, do you? Binds you in any way? A. That is right.

"Q. I take it, Mrs. Wynacht, that therefore you don't feel that you should pay the Abstract Guaranty Company for anything because you own all the business? A. Right.

"Q. You own just as much interest in the abstract business as you do in the title insurance business, and vice versa? A. Right.

"Q. And you have always felt that way ever since you signed that contract, have you not? A. That is right.

"Q. And you are—that is why you haven't paid the Faveros a third, isn't that right? A. That is right.

"Q. In fact, after you had paid back the $58,000 plus interest, you said to yourself, 'I am paying the Faveros not a cent more', is that right? A. No, I didn't say that to myself, I have never said that to myself.

"Q. Well, at any rate you haven't paid them, have you? A. That is right, I haven't.

"Q. And you don't think that they are entitled to it, do you? A. No, I don't.

"Q. So you don't think, then, that the terms of this contract means anything, do you? A. It shouldn't have been in there.

"Q. Do you? A. No, I don't because the way it was done.

"Q. And this covers old ground again, but this one ques-

tion: You didn't let the Faveros know anything about that until way in the '50's some time, did you, until just before this action was brought? A. They knew that I didn't like that when we signed it.

"Q. I didn't ask you that. A. They knew that when I signed it, that I didn't like it.

"Q. Well, I asked you— A. It was a shock to me.

"Q. You never told them? A. Not to my knowledge, I have told Mr. Wood.

"Q. How many times did you tell him? A. Oh, I don't know.

"Q. Well, tell the court how you expressed yourself to Mr. Wood, since you remember it distinctly? A. Well, I don't know how I expressed myself to Mr. Wood.

"Q. Well isn't it true that you never expressed yourself to Mr. Wood until after I wrote a letter in connection with this matter asking why those profits weren't divided? A. No, I wrote, I talked to him before that. * * *

"Q. Well, Mrs. Wynacht, it wouldn't have made any difference to you what words Mr. Wood used to describe the assets sold to you, if in addition to that he said that the Faveros were entitled to a one-third of those assets, you wouldn't have paid any attention to a contract and paid or honored this one-third of the interest in those assets to the Faveros, regardless of what words had been used to describe the business or those assets, would you? A. Well at that time, and now, it would be a lot different—what I have learned in 12 years, it would be a lot different now than it would have been at that time.

"Q. Well, this is the time to tell us the difference. A. That at that particular time I just didn't know; that they were entitled to a third, but they had it in their name and here it was— you take it or leave it.

"Q. Well, you don't feel, you feel the same way now? A. Oh definitely.

"Q. What is the difference you mentioned between the way

you felt then and now? A. Well, something could have been done at the beginning, at the beginning there, it would have been different.

"Q. Well, just to carry that through, I meant your feeling hasn't changed any about this one-third? A. No, that is right."

Without any discussion of the matter with the Faveros, Wynacht purchased the interest of Neil Anderson in the business.

Having carefully reviewed the evidence, in our view it clearly preponderates in favor of the plaintiffs.

One other point should be considered, and that is the contention raised here in the brief of the respondents that the appeal is premature.

It is our view that such a contention could be raised only by one who is injuriously affected by the judgment, in other words, an aggrieved party.

Plaintiffs certainly cannot assert they are injuriously affected or aggrieved by the judgment or by this appeal. The district court found generally for the plaintiffs in accordance with the issues raised by their complaint, and certainly they have not been injuriously affected, nor are they aggrieved.

The judgment is affirmed.

MR. JUSTICES ADAIR, DOYLE, CASTLES, and JOHN C. HARRISON, concur.